# FAIRBANK *v.* UNITED STATES.

ERROR TO THE DISTRICT COURT OF THE UNITED STATES FOR THE DISTRICT OF MINNESOTA.

No. 226.   Argued December 13, 1900. — Decided April 15, 1901.

A stamp tax on a foreign bill of lading is, in substance and effect, equivalent to a tax on the articles included in that bill of lading, and therefore is a tax or duty on exports, and therefore in conflict with article I, section 9 of the Constitution of the United States, that "No tax or duty shall be laid on articles exported from any State."

An act of Congress is to be accepted as constitutional, unless on examination it clearly appears to be in conflict with provisions of the Federal Constitution.

If the Constitution in its grant of powers is to be able to carry into full effect the powers granted, it is equally imperative that where prohibition or limitation is placed upon the power of Congress, that prohibition or limitation should be enforced in its spirit and to its entirety.

On March 7, 1900, plaintiff in error was convicted in the District Court of the United States for the District of Minnesota on the charge of issuing as agent of the Northern Pacific Rail-

way Company an export bill of lading upon certain wheat exported from Minnesota to Liverpool, England, without affixing thereto an internal revenue stamp, as required by the act of June 13, 1898, c. 448, 30 Stat. 448. Upon that conviction he was sentenced to pay a fine of $25. His contention on the trial was that that act, so far as it imposes a stamp tax on foreign bills of lading, is in conflict with article I, section 9, of the Constitution of the United States, which reads: "No tax or duty shall be laid on articles exported from any State." This contention was not sustained by the trial court, and this writ of error was sued out to review the judgment solely upon the foregoing constitutional question.

Section 6 of the act reads :

"SEC. 6. That on and after the first day of July, eighteen hundred and ninety-eight, there shall be levied, collected and paid, for and in respect of the several bonds, debentures or certificates of stock and of indebtedness, and other documents, instruments, matters and things mentioned and described in Schedule A of this act, or for or in respect of the vellum, parchment or paper upon which such instruments, matters or things, or any of them, shall be written or printed, by any person or persons, or, party, who shall make, sign or issue the same, or for whose use or benefit the same shall be made, signed or issued, the several taxes or sums of money set down in figures against the same respectively, or otherwise specified or set forth in the said schedule."

In Schedule "A" is this clause :

"Bills of lading or receipt (other than charter party) for any goods, merchandise or effects, to be exported from a port or place in the United States to any foreign port or place, ten cents."

Also the following :

"It shall be the duty of every railroad or steamboat company, carrier, express company or corporation, or person whose occupation is to act as such, to issue to the shipper or consignor, or his agent, or person from whom any goods are accepted for transportation, a bill of lading, manifest or other evidence of receipt and forwarding for each shipment received for carriage and transportation, whether in bulk or in boxes, bales, packages, bundles, or not so enclosed or included; and there shall be duly attached

and canceled, as is in this act provided, to each of said bills of lading, manifests or other memorandum, and to each duplicate thereof, a stamp of the value of one cent."

And this proviso at the end of the schedule :

"*Provided,* That the stamp duties imposed by the foregoing schedule on manifests, bills of lading and passage tickets shall not apply to steamboats or other vessels plying between ports of the United States and ports in British North America."

*Mr. C. W. Bunn* for plaintiff in error. *Mr. George A. King* and *Mr. William B. King* filed a brief on behalf of plaintiff in error.

*Mr. Solicitor General* for the United States.

MR. JUSTICE BREWER, after stating the case, delivered the opinion of the court.

The constitutionality of an act of Congress is a matter always requiring the most careful consideration. The presumptions are in favor of constitutionality, and before a court is justified in holding that the legislative power has been exercised beyond the limits granted, or in conflict with restrictions imposed by the fundamental law, the excess or conflict should be clear. And yet, when clear, if written constitutions are to be regarded as of value, the duty of the court is plain to uphold the Constitution, although in so doing the legislative enactment falls. The reasoning in support of this was in the early history of this court forcibly declared by Chief Justice Marshall in *Marbury* v. *Madison,* 1 Cranch, 137, 177, and nothing can be said to add to the strength of his reasoning. His language is worthy of quotation :

"The Constitution is either a superior paramount law, unchangeable by ordinary means, or it is on a level with ordinary legislative acts, and, like other acts, is alterable when the legislature shall please to alter it.

"If the former part of the alternative be true, then a legislative act contrary to the Constitution is not law ; if the latter

part be true, then written constitutions are absurd attempts, on the part of the people, to limit a power in its own nature illimitable.

" Certainly all those who have framed written constitutions contemplate them as forming the fundamental and paramount law of the nation, and, consequently, the theory of every such government must be that an act of the legislature repugnant to the Constitution is void.

" This theory is essentially attached to a written constitution and is consequently to be considered, by this court, as one of the fundamental principles of our society.

" It is emphatically the province and duty of the judicial department to say what the law is. Those who apply the rule to particula · cases must of necessity expound and interpret that rule. If two laws conflict with each other, the courts must decide on the operation of each.

" So if a law be in opposition to the Constitution ; if both the law and the Constitution apply to a particular case, so that the court must either decide that case conformably to the law, disregarding the Constitution, or conformably to the Constitution, disregarding the law, the court must determine which of these conflicting rules governs the case. This is of the very essence of judicial duty.

" If, then, the courts are to regard the Constitution, and the Constitution is superior to any ordinary act of the legislature, the Constitution, and not such ordinary act, must govern the case to which they both apply.

\*      \*      \*      \*      \*      \*      \*      \*

" The particular phraseology of the Constitution of the United States confirms and strengthens the principle, supposed to be essential to all written constitutions, that a law repugnant to the Constitution is void ; and that courts as well as other departments are bound by that instrument."

This judicial duty of upholding the provisions of the Constitution as against any legislation conflicting therewith has become now an accepted fact in the judicial life of this nation. That in the enforcement of this rule the decisions, national and State, are not all in harmony is not strange. Conflicts

between constitutions and statutes have been easily found by some courts. It has been said, and not inappropriately, that in certain States the courts have been strenuous as to the letter of the state constitution and have enforced compliance with it under circumstances in which a full recognition of the spirit of the constitution and the general power of legislation would have justified a different conclusion. We do not care to enter into any discussion of these varied decisions. We proceed upon the rule often expressed in this court that an act of Congress is to be accepted as constitutional unless on examination it clearly appears to be in conflict with provisions of the Federal Constitution.

In the light of this rule the inquiry naturally is upon what principles and in what spirit should the provisions of the Federal Constitution be construed? There are in that instrument grants of power, prohibitions and a general reservation of ungranted powers. That in the grant of powers there was no purpose to bind governmental action by the restrictive force of a code of criminal procedure has been again and again asserted. The words expressing the various grants in the Constitution are words of general import, and they are to be construed as such, and as granting to the full extent the powers named. Further, by the last clause of sec. 8, art. 1, Congress is authorized " to make all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by this Constitution in the Government of the United States, or in any department or officer thereof." This construed on the same principles vests in Congress a wide range of discretion as to the means by which the powers granted are to be carried into execution. This matter was at an early day presented to this court, and it was affirmed that there could be no narrow and technical limitation or construction; that the instrument should be taken as a constitution. In the course of the opinion the Chief Justice said:

" The subject is the execution of those great powers on which the welfare of a nation essentially depends. It must have been the intention of those who gave these powers to insure, as far as human prudence could insure, their beneficial execution.

This could not be done by confining the choice of means to such narrow limits as not to leave it in the power of Congress to adopt any which might be appropriate, and which were conducive to the end. This provision is made in a Constitution intended to endure for ages to come, and, consequently, to be adapted to the various crises of human affairs. To have prescribed the means by which government should, in all future time, execute its powers, would have been to change, entirely, the character of the instrument, and give it the properties of a legal code. It would have been an unwise attempt to provide, by immutable rules, for exigencies which, if foreseen at all, must have been seen dimly, and which can be best provided for as they occur. To have declared that the best means shall not be used, but those alone without which the power given would be nugatory, would have been to deprive the legislature of the capacity to avail itself of experience, to exercise its reason, and to accommodate its legislation to circumstances." *M'Culloch* v. *Maryland*, 4 Wheat. 316, 415.

And thereafter, in language which has become axiomatic in constitutional construction (p. 421)—

"We admit, as all must admit, that the powers of the Government are limited, and that its limits are not to be transcended. But we think the sound construction of the Constitution must allow to the national legislature that discretion, with respect to the means by which the powers it confers are to be carried into execution, which will enable that body to perform the high duties assigned to it, in the manner most beneficial to the people. Let the end be legitimate, let it be within the scope of the Constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the Constitution, are constitutional."

It is true that in that and other kindred cases the question was as to the scope and extent of the powers granted, and the language quoted must be taken as appropriate to that question and as stating the rule by which the grants of the Constitution should be construed.

We are not here confronted with a question of the extent of the powers of Congress but one of the limitations imposed by

the Constitution on its action, and it seems to us clear that the same rule and spirit of construction must also be recognized. If powers granted are to be taken as broadly granted and as carrying with them authority to pass those acts which may be reasonably necessary to carry them into full execution; in other words, if the Constitution in its grant of powers is to be so construed that Congress shall be able to carry into full effect the powers granted, it is equally imperative that where prohibition or limitation is placed upon the power of Congress that prohibition or limitation should be enforced in its spirit and to its entirety. It would be a strange rule of construction that language granting powers is to be liberally construed and that language of restriction is to be narrowly and technically construed. Especially is this true when in respect to grants of powers there is as heretofore noticed the help found in the last clause of the eighth section, and no such helping clause in respect to prohibitions and limitations. The true spirit of constitutional interpretation in both directions is to give full, liberal construction to the language, aiming ever to show fidelity to the spirit and purpose.

With this rule in mind we pass to a consideration of the precise question presented. The constitutional provision is "no tax or duty shall be laid on articles exported from any State." The statute challenged imposes on "bills of lading for any goods, merchandise, or effects, to be exported from any port or place in the United States to any foreign port or place, ten cents." The contention on the part of the Government is that no tax or duty is placed upon the article exported; that so far as the question is in respect to what may be exported and how it should be exported, the statute, following the Constitution, imposes no restriction; that the full scope of the legislation is to impose a stamp duty on a document not necessarily though ordinarily used in connection with the exportation of goods; that it is a mere stamp imposition on an instrument, and, similar to many such taxes which are imposed by Congress by virtue of its general power of taxation, not upon this alone, but upon a great variety of instruments used in the ordinary transactions of business. On the other hand, it is insisted that though Congress by

virtue of its general taxing power may impose stamp duties on the great bulk of instruments used in commerce, yet it cannot in the exercise of such power interfere with that freedom from governmental burden in the matter of exports which it was the intention of the Constitution to protect and preserve. It must be noticed that by this act of 1898 while a variety of stamp taxes are imposed, a discrimination is made between the tax imposed upon an ordinary internal bill of lading and that upon one having respect solely to matters of export. An ordinary bill of lading is charged one cent; an export bill of lading ten cents. So it is insisted that there was not simply an effort to place a stamp duty on all documents of a similar nature but by virtue of the difference an attempt to burden exports with a discriminating and excessive tax.

The requirement of the Constitution is that exports should be free from any governmental burden. The language is "no tax or duty." Whether such provision is or is not wise is a question of policy with which the courts have nothing to do. We know historically that it was one of the compromises which entered into and made possible the adoption of the Constitution. It is a restriction on the power of Congress; and as in accordance with the rules heretofore noticed the grants of powers should be so construed as to give full efficacy to those powers and enable Congress to use such means as it deems necessary to carry them into effect, so in like manner a restriction should be enforced in accordance with its letter and spirit, and no legislation can be tolerated which, although it may not conflict with the letter, destroys the spirit and purpose of the restriction imposed. If, for instance, Congress may place a stamp duty of ten cents on bills of lading on goods to be exported it is because it has power to do so, and if it has power to impose this amount of stamp duty it has like power to impose any sum in the way of stamp duty which it sees fit. And it needs but a moment's reflection to show that thereby it can as effectually place a burden upon exports as though it placed a tax directly upon the articles exported. It can, for the purposes of revenue, receive just as much as though it placed a duty directly upon the

articles, and it can just as fully restrict the free exportation which was one of the purposes of the Constitution.

The power to tax is the power to destroy. And that power can be exercised not only by a tax directly on articles exported, but also and equally by a stamp duty on bills of lading evidencing the export. To the suggestion that a stamp duty is necessarily small in amount, we reply that the fact is to the contrary. The act by which the stamp tax in question was imposed imposes a like tax on many other instruments, and in some instances graduating the amount thereof by the value of the property conveyed or affected by the instrument taxed. Thus, " each sale, agreement of sale, or agreement to sell any products or merchandise at any exchange, or board of trade, or other similar place " is subject to a stamp tax in the sum of one cent for each hundred dollars of value of the property sold or agreed to be sold. Bills of exchange are likewise taxed by a graduated scale. Deeds or other instruments for the conveyance of land are charged with a stamp tax of fifty cents for each five hundred dollars of value of property conveyed. And so of others. It is a well-known fact that under this graduated system many instruments are subject to stamp duties of large amount. No question has ever been raised as to this power of graduating, and if valid in the cases of bills of exchange, agreements of sale, or conveyances of property, it is equally valid as to bills of lading. The fact that Congress has not graduated the stamp tax on bills of lading does not affect the question of power. By a graduated system, although the tax is called a tax on " the vellum, parchment or paper " upon which transactions are written, or by which they are evidenced, a burden may be cast upon exports sufficient to check or retard them, and which will directly conflict with the constitutional provision that no tax or duty shall be laid thereon. The question of power is not to be determined by the amount of the burden attempted to be cast. The constitutional language is " no tax or duty." A ten cent tax or duty is in conflict with that provision as certainly as an hundred dollar tax or duty. Constitutional mandates are imperative. The question is never one of amount but one of power. The

applicable maxim is "*obsta principiis*," not "*de minimis non curatur lex*."

Counsel for the Government in his interpretation of the scope and meaning of this constitutional limitation says:

"To give Congress the power to lay a tax or duty 'on articles exported from any State,' meant to authorize inequality as among the States in the matter of taxation. If the North happened in control in Congress, it might tax the staples of the South; if the South were in power, it might place a duty on the exports of the North. As a part, therefore, of the great compromise between the North and the South, this clause was inserted in the Constitution. The prohibition was applied not to the taxing of the act of exportation or the document evidencing the receipt of goods for export, for these exist with substantial uniformity throughout the country, but to the laying of a tax or duty on the *articles exported*, for these could not be taxed without discriminating against some States and in favor of others."

This argument does not commend itself to our judgment. Its implication is that the sole purpose of this constitutional restriction was to prevent discrimination between the States by imposing an export tax on certain articles which might be a product of only a few of the States, and which should be enforced only so far as necessary to prevent such discrimination. If mere discrimination between the States was all that was contemplated it would seem to follow that an *ad valorem* tax upon all exports would not be obnoxious to this constitutional prohibition. But surely under this limitation Congress can impose an export tax neither on one article of export, nor on all articles of export. In other words, the purpose of the restriction is that exportation, all exportation, shall be free from national burden. This intent, although obvious from the language of the clause itself, is reinforced by the fact that in the constitutional convention Mr. Clymer moved to insert after the word "duty" the words "for the purpose of revenue" but the motion was voted down. So it is clear that the framers of the Constitution intended not merely that exports should not be made a source of revenue to the National Government, but that the

National Government should put nothing in the way of burden upon such exports. If all exports must be free from national tax or duty, such freedom requires not simply an omission of a tax upon the articles exported, but also a freedom from any tax which directly burdens the exportation, and, as we have show a stamp tax on a bill of lading, which evidences the export is just as clearly a burden on the exportation as a direct tax on the article mentioned in the bill of lading as the subject of the export.

In *Nicol* v. *Ames*, 173 U. S. 509, we had occasion to consider this very act in reference to another stamp duty required by the same schedule, " A," to wit, the clause:

" Upon each sale, agreement of sale, or agreement to sell, any products or merchandise at any exchange, or board of trade, or other similar place, either for present or future delivery, for each one hundred dollars in value of said sale or agreement of sale or agreement to sell, one cent, and for each additional one hundred dollars, or fractional part thereof in excess of one hundred dollars, one cent."

We sustained that tax as a tax upon the privilege or facilities obtained by dealings on exchange, saying (p. 521):

" A tax upon the privilege of selling property at the exchange and of thus using the facilities there offered in accomplishing the sale differs radically from a tax upon every sale made in any place. The latter tax is really and practically upon property."

If it be true that a stamp tax required upon every instrument evidencing a sale is really and practically a tax upon the property sold, it is equally clear that a stamp duty upon foreign bills of lading is a tax upon the articles exported.

These considerations find ample support in prior adjudications of this court. Thus, in *Almy* v. *California*, 24 How. 169, 174, it appeared that the State of California had imposed a stamp tax on bills of lading for gold or silver shipped to any place outside of the State, and the contention was that such stamp tax was not a tax on the goods themselves, but the court said :

" But a tax or duty on a bill of lading, although differing in

form from a duty on the article shipped, is in substance the same thing; for a bill of lading or some written instrument of the same import is necessarily always associated with every shipment of articles of commerce from the ports of one country to those of another. The necessities of commerce require it. And it is hardly less necessary to the existence of such commerce than casks to cover tobacco or bagging to cover cotton when such articles are exported to a foreign country; for no one would put his property in the hands of a ship master without taking written evidence of its receipt on board the vessel, and the purposes for which it was placed in his hands. The merchant could not send an agent with every vessel, to inform the consignee of the cargo what articles he had shipped, and prove the contract of the master if he failed to deliver them in safety. A bill of lading, therefore, or some equivalent instrument of writing, is invariably associated with every cargo of merchandise exported to a foreign country, and consequently a duty upon that is, in substance and effect, a duty on the article exported."

It is true that thereafter, in *Woodruff* v. *Parham*, 8 Wall. 123, it was held that the words "imports" and "exports" as used in the Constitution were used to define the shipment of articles between this and a foreign country and not that between the States, and while therefore that case is no longer an authority as to what is or what is not an export, the proposition that a stamp duty on a bill of lading is in effect a duty on the article transported remains unaffected. In other words, that decision affirms the great principle that what cannot be done directly because of constitutional restriction cannot be accomplished indirectly by legislation which accomplishes the same result. But that principle is not dependent alone upon the case cited. It was recognized long anterior thereto in *Brown* v. *Maryland*, 12 Wheat. 419. In that case it appeared that the State of Maryland, in order to raise a revenue for state purposes, required all importers of certain foreign articles to take out a license before they were authorized to sell the goods so imported, and it was held that such license tax, although in form a tax upon the person importing for the privilege of sell-

ing the goods imported, was in fact a tax on imports, and that the mode of imposing it by giving it the form of a tax on the occupation of importer merely varied the form without changing the substance. The argument in the opinion in that case, announced by Chief Justice Marshall, remains unanswered. As the States cannot directly interfere with the freedom of imports they cannot by any form of taxation, although not directly on the importation, restrict such freedom, Congress alone having the power to prescribe duties therefor. In like manner the freedom of exportation being guaranteed by the Constitution it cannot be disturbed by any form of legislation which burdens that exportation. The form in which the burden is imposed cannot vary the substance. In the course of his argument Chief Justice Marshall used this illustration :

"All must perceive that a tax on the sale of an article, imported only for sale, is a tax on the article itself. It is true the State may tax occupations generally, but this tax must be paid by those who employ the individual, or is a tax on his business. The lawyer, the physician or the mechanic must either charge more on the article in which he deals or the thing itself is taxed through his person. This the State has a right to do, because no constitutional prohibition extends to it. So a tax on the occupation of an importer is, in like manner, a tax on importation. It must add to the price of the article, and be paid by the consumer or by the importer himself, in like manner as a direct duty on the article itself would be made. This the State has not a right to do, because it is prohibited by the Constitution." p. 444.

The first clause of section 8 of Article 1 of the Constitution gives to Congress "power to lay and collect taxes, duties, imposts and excises." Were this the only constitutional provision in respect to the matter of taxation there would be no doubt that, tried by the settled rules of constitutional interpretation, Congress would have full power and full discretion as to both objects and modes of taxation. But there are also expressed in the same instrument three limitations. As said by Chief Justice Chase, in the *License Tax Cases*, 5 Wall. 462, 471 :

"It is true that the power of Congress to tax is a very exten-

sive power. It is given in the Constitution, with only one exception and only two qualifications. Congress cannot tax exports, and it must impose direct taxes by the rule of apportionment, and indirect taxes by the rule of uniformity. Thus limited, and thus only, it reaches every subject, and may be exercised at discretion."

This proposition is restated by counsel for Government at the commencement of his argument, and is undoubtedly correct. We have hitherto had occasion to consider the two qualifications—the one that direct taxes must be imposed by the rule of apportionment and the other that indirect taxes shall be uniform throughout the United States. In the *Income Tax Cases, Pollock* v. *Farmers' Loan & Trust Co.*, 157 U. S 429; 158 U. S. 601, the constitutional provision as to the apportionment of direct taxes was elaborately considered, and it was held that a tax on the income made up of the rents of real estate and one on the income from personal property were substantially direct taxes on the real estate and the personalty. In the first of these cases, on page 581, discussing the principles of constitutional construction, the Chief Justice said:

"If it be true that by varying the form the substance may be changed, it is not easy to see that anything would remain of the limitations of the Constitution or of the rule of taxation and representation, so carefully recognized and guarded in favor of the citizens of each State. But constitutional provisions cannot be thus evaded. It is the substance and not the form which controls, as has indeed been established by repeated decisions of this court. Thus in *Brown* v. *Maryland*, 12 Wheat. 419, 444, it was held that the tax on the occupation of an importer was the same as a tax on imports, and therefore void. And Chief Justice Marshall said: 'It is impossible to conceal from ourselves that this is varying the form without varying the substance. It is treating a prohibition which is general, as if it were confined to a particular mode of doing the forbidden thing. All must perceive, that a tax on the sale of an article, imported only for sale, is a tax on the article itself.'

"In *Weston* v. *Charleston*, 2 Pet. 449, it was held that a tax on the income of United States securities was a tax on the

securities themselves, and equally inadmissible. The ordinance of the city of Charleston involved in that case was exceedingly obscure; but the opinions of Mr. Justice Thompson and Mr. Justice Johnson, who dissented, make it clear that the levy was upon the interest of the bonds and not upon the bonds, and they held that it was an income tax, and as such sustainable; but the majority of the court, Chief Justice Marshall delivering the opinion, overruled that contention.

" So in *Dobbins* v. *Commissioners*, 16 Pet. 435, it was decided that the income from an official position could not be taxed if the office itself was exempt.

" In *Almy* v. *California*, 24 How. 169, it was held that a duty on a bill of lading was the same thing as a duty on the article which it represented; in *Railroad Co.* v. *Jackson*, 7 Wall. 262, that a tax upon the interest payable on bonds was a tax not upon the debtor, but upon the security; and in *Cook* v. *Pennsylvania*, 97 U. S. 566, that a tax upon the amount of sales of goods made by an auctioneer was a tax upon the goods sold.

" In *Philadelphia Steamship Co.* v. *Pennsylvania*, 122 U. S. 326, and *Leloup* v. *Mobile*, 127 U. S. 640, it was held that a tax on income received from interstate commerce was a tax upon the commerce itself; and therefore unauthorized. And so, although it is thoroughly settled that where by way of duties laid on the transportation of the subjects of interstate commerce, and on the receipts derived therefrom, or on the occupation or business of carrying it on, a tax is levied by a State on interstate commerce, such taxation amounts to a regulation of such commerce, and cannot be sustained, yet the property in a State belonging to a corporation, whether foreign or domestic, engaged in foreign or domestic commerce, may be taxed, and when the tax is substantially a mere tax on property, and not one imposed on the privilege of doing interstate commerce, the exaction may be sustained. 'The substance, and not the shadow, determines the validity of the exercise of the power.' *Postal Telegraph Co.* v. *Adams*, 155 U. S. 688, 698."

In *Knowlton* v. *Moore*, 178 U. S. 41, we considered the qualification in the matter of uniformity. The question presented was the validity of the inheritance tax imposed by the act of

June 13, 1898. 30 Stat. 448. After showing that the tax was not a direct tax within the constitutional meaning of the term, we examined the objection that it was not uniform throughout the United States, and, after full consideration, held that the uniformity required was a geographical and not an intrinsic uniformity, and was synonymous with the expression "to operate generally throughout the United States." While upon some of the questions in that case there was a difference of opinion, yet concerning the construction of the uniformity clause the Justices who took part in the decision were agreed. After discussing the construction of the uniformity clause, Mr. Justice White, speaking for the court, proceeded to show that the tax in question did not violate such uniformity. There was no suggestion that the qualification could be disregarded or limited in any legislation; the opinion proceeded upon the assumption that the uniformity provision was an absolute restriction on the power of Congress; and the argument was to demonstrate that the tax in question in no manner conflicted with either the letter or spirit of such restriction. If it had been in the mind of the court that such restriction as to uniformity could be evaded by a mere change in the form of legislation the opinion could have been less elaborate and the difficulties of the case largely avoided.

We have referred to these cases for the purpose of showing that the rule of construction of grants of powers has been also applied when the question was as to restrictions and limitations. Other cases may also well be referred to in this connection.

In *Robbins* v. *Shelby County Taxing District*, 120 U. S. 489, the question presented was whether an act of the State of Tennessee, requiring " all drummers and all persons not having a regular licensed house of business in the taxing district of Shelby County, offering for sale, or selling goods, wares or merchandise therein by sample," to pay a certain tax to the county trustee, could be enforced as to those drummers who were engaged simply in soliciting business in the State of Tennessee in behalf of citizens of other States. It was held that it could not, that such act of solicitation, being a matter of interstate commerce, was, therefore, beyond the power of the State to

regulate.    In the opinion, Mr. Justice Bradley, speaking for the court, said:

" In view of these fundamental principles, which are to govern our decision, we may approach the question submitted to us in the present case, and inquire whether it is competent for a State to levy a tax or impose any other restriction upon the citizens or inhabitants of other States for selling or seeking to sell their goods in such State before they are introduced therein. Do not such restrictions affect the very foundation of interstate trade?    How is a manufacturer, or a merchant, of one State to sell his goods in another State, without, in some way, obtaining orders therefor?    Must he be compelled to send them at a venture, without knowing whether there is any demand for them?    This may, undoubtedly, be safely done with regard to some products for which there is always a market and a demand, or where the course of trade has established a general and unlimited demand.    A raiser of farm produce in New Jersey or Connecticut, or a manufacturer of leather or woodenware, may, perhaps, safely take his goods to the city of New York and be sure of finding a stable and reliable market for them.    But there are hundreds, perhaps thousands, of articles which no person would think of exporting to another State without first procuring an order for them.    It is true, a merchant or manufacturer in one State may erect or hire a warehouse or store in another State, in which to place his goods, and await the chances of being able to sell them.    But this would require a warehouse or store in every State with which he might desire to trade.    Surely, he cannot be compelled to take this inconvenient and expensive course.    In certain branches of business it may be adopted with advantage.    Many manufacturers do open houses or places of business in other States than those in which they reside, and send their goods there to be kept on sale.    But this is a matter of convenience, and not of compulsion, and would neither suit the convenience nor be within the ability of many others engaged in the same kind of business, and would be entirely unsuited to many branches of business.    In these cases, then, what shall the merchant or manufacturer do who wishes to sell his goods in other States?

Must he sit still in his factory or warehouse, and, wait for the people of those States to come to him? This would be a silly and ruinous proceeding.

"The only other way, and the one, perhaps, which most extensively prevails, is to obtain orders from persons residing or doing business in those other States. But how is the merchant or manufacturer to secure such orders? If he may be taxed by such States for doing so, who shall limit the tax? It may amount to prohibition. To say that such a tax is not a burden on interstate commerce, is to speak at least unadvisedly and without due attention to the truth of things." p. 494.

The scope of this argument is that inasmuch as interstate commerce can only be regulated by Congress, and is free from state interference, state legislation, although not directly prohibiting interstate commerce, if in substance and effect directly casting a burden thereon, cannot be sustained. Or, in other words, constitutional provisions, whether operating by way of grant or limitation, are to be enforced according to their letter and spirit, and cannot be evaded by any legislation which, though not in terms trespassing on the letter, yet in substance and effect destroy the grant or limitation.

In *Monongahela Navigation Co.* v. *United States,* 148 U. S. 312, it appeared that Congress had passed an act authorizing the condemnation of a lock and dam known as the Upper Lock and Dam on the Monongahela River, belonging to the navigation company, with a proviso, "that in estimating the sum to be paid by the United States the franchise of said corporation to collect tolls shall not be considered or estimated"—the idea being that simply the value of the tangible property was all that need be paid for; and it was held that such proviso could not be sustained; that while the right of condemnation was clear, it was limited by the clause in the Fifth Amendment, "nor shall private property be taken for public use without just compensation," and that that language required payment of the entire value of the property of which the owner was deprived, the court saying:

"Congress has supreme control over the regulation of commerce, but if, in exercising that supreme control, it deems it

necessary to take private property, then it must proceed subject to the limitations imposed by this Fifth Amendment, and can take only on payment of just compensation. The power to regulate commerce is not given in any broader terms than that to establish post offices and post roads; but, if Congress wishes to take private property upon which to build a post office, it must either agree upon a price with the owner, or in condemnation pay just compensation therefor. And if that property be improved under authority of a charter granted by the State, with a franchise to take tolls for the use of the improvement, in order to determine the just compensation, such franchise must be taken into account. Because Congress has power to take the property, it does not follow that it may destroy the franchise without compensation. Whatever be the true value of that which it takes from the individual owner must be paid to him, before it can be said that just compensation for the property has been made. And that which is true in respect to a condemnation of property for a post office is equally true when condemnation is sought for the purpose of improving a natural highway. Suppose, in the improvement of a navigable stream, it was deemed essential to construct a canal with locks, in order to pass around rapids or falls. Of the power of Congress to condemn whatever land may be necessary for such canal, there can be no question; and of the equal necessity of paying full compensation for all private property taken there can be as little doubt. If a man's house must be taken, that must be paid for; and, if the property is held and improved under a franchise from the State, with power to take tolls, that franchise must be paid for, because it is a substantial element in the value of the property taken. So, coming to the case before us, while the power of Congress to take this property is unquestionable, yet the power to take is subject to the constitutional limitation of just compensation." p. 336.

In short, the court held in that case that Congress could not by any declaration in its statute avoid, qualify or limit the special restriction placed upon its power, but that it must be enforced according to its letter and spirit and to the full extent.

In *Boyd* v. *United States*, 116 U. S. 616, the fifth section of

the act of June 22, 1874, 18 Stat. 186, which authorized a court of the United States in revenue cases, on motion of the District Attorney, to require the defendant or the claimant to produce in court his private books, invoices and papers, or else that the allegations of the attorney as to their contents should be taken as confessed, was held unconstitutional and void as applied to an action for penalties or to establish a forfeiture of the party's goods, because repugnant to the Fourth and Fifth Amendments to the Constitution. The case is significant, for the statute was not so much in conflict with the letter as with the spirit of the restrictive clauses of those amendments, and in respect to this the court said:

"Though the proceeding in question is divested of many of the aggravating incidents of actual search and seizure, yet, as before said, it contains their substance and essence, and effects their substantial purpose. It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of the courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon. Their motto should be *obsta principiis.*" p. 635.

On the other hand, *Pace* v. *Burgess, Collector,* 92 U. S. 372, is cited as an authority against these conclusions; but an examination of the case shows that this is a mistake. The act of 1868, 15 Stat. 125, imposed certain taxes on the manufacture of tobacco for consumption or use, required as evidence of the payment of such taxes the affixing of revenue stamps to the packages, and forbade the removal of any tobacco from the factory without payment of the taxes and affixing of the stamps. It further provided that tobacco might be manufactured for export and exported without payment of any tax. Sections 73

and 74, page 157, are the sections making provision for such export, and authorized the removal of the tobacco from the manufactory to certain designated warehouses at ports of entry upon the giving of suitable bonds.   The latter part of section 74 reads :

" All tobacco and snuff intended for export, before being removed from the manufactory shall have affixed to each package an engraved stamp indicative of such intention, to be provided and furnished to the several collectors, as in the case of other stamps, and to be charged to them and accounted for in the same manner ; and for the expense attending the providing and affixing such stamps, twenty-five cents for each package so stamped shall be paid to the collector on making the entry for such transportation."

This act was amended in 1872, 17 Stat. 230, the amendments to sections 73 and 74 being found on page 254; but they have no significance in respect to the present question.   Now, it was the cost of these removal stamps which was complained of as in conflict with the constitutional provision against a tax or duty upon exports, but the contention was overruled, the court saying (pp. 374, 375, 376):

" The plaintiff contends that the charge for the stamps required to be placed on packages of manufactured tobacco intended for exportation was and is a duty on exports, within the meaning of that clause in the Constitution of the United States which declares that ' no tax or duty shall be laid on articles exported from any State.'   But it is manifest that such was not its character or object.   The stamp was intended for no other purpose than to separate and identify the tobacco which the manufacturer desired to export, and thereby, instead of taxing it, to relieve it from the taxation to which other tobacco was subjected.   It was a means devised to prevent fraud, and secure the faithful carrying out of the declared intent with regard to the tobacco so marked.   .   .   .   We know how next to impossible it is to prevent fraudulent practices wherever the internal revenue is concerned ; and the pretext of intending to export such an article as manufactured tobacco would open the widest door to such practices, if the greatest strictness and pre-

cautions were not observed. The proper fees accruing in the due administration of the laws and regulations necessary to be observed to protect the Government from imposition and fraud likely to be committed under the pretence of exportation are in no sense a duty on exportation. They are simply the compensation given for services properly rendered. The rule by which they are estimated may be an arbitrary one; but an arbitrary rule may be more convenient and less onerous than any other which can be adopted. The point to guard against is, the imposition of a duty under the pretext of fixing a fee. In the case under consideration, having due regard to that latitude of discretion which the legislature is entitled to exercise in the selection of the means for attaining a constitutional object, we cannot say that the charge imposed is excessive, or that it amounts to an infringement of the constitutional provision referred to. We cannot say that it is a tax or duty instead of what it purports to be, a fee or charge, for the employment of that instrumentality which the circumstances of the case render necessary for the protection of the Government.

"One cause of difficulty in the case arises from the use of stamps as one of the means of segregating and identifying the property intended to be exported. It is the form in which many taxes and duties are imposed and liquidated; stamps being seldom used except for the purpose of levying a duty or tax. But we must regard things rather than names. A stamp may be used, and, in the case before us we think it is used for quite a different purpose from that of imposing a tax or duty; indeed, it is used for the very contrary purpose—that of securing exemption from a tax or duty. The stamps required by recent laws to be affixed to all agreements, documents and papers, and to different articles of manufacture, were really and in truth taxes and duties, or evidences of the payment of taxes and duties, and were intended as such. The stamp required to be placed on gold dust exported from California by a law of that State was clearly an export tax, as this court decided in the case of *Almy* v. *The State of California*, 24 How. 169. In all such cases no one could entertain a reasonable doubt on the subject."

Obviously, this opinion, taken as a whole, makes against rather than in favor of the contention of counsel for the Government. Its argument is to the effect that the stamp required was in no proper sense a tax for revenue; that there was no burden of any kind on the export; that it was something to facilitate rather than to hinder exports; that it was only a means of identification and to enable parties to remove their tobacco from the manufactory to the warehouse, and that the sum demanded was simply a matter of compensation for services rendered. The statute itself declared that the twenty-five cents was to be paid " for the expense attending the providing and affixing" of the stamps. This clearly excludes the idea that any tax or duty was intended to be imposed, and the opinion notes the fact that the difficulty arises because ordinarily stamps are used for the purpose of duty or tax, says that we must always regard things rather than names, and that this stamp was not used for the purpose of tax or duty but only for identification and to prevent frauds on the Government. If it had been supposed that a stamp tax could properly be charged, the line of argument would have been entirely different. In the case before us the stamp is distinctly for the purpose of revenue and not by way of compensation for services rendered, so that the question is whether revenue can be collected from exports by changing the form of the tax from a tax on the article exported to a tax on the bill of lading which evidences the export.

Again, it is said that if this stamp duty on foreign bills of lading cannot be sustained it will follow that tonnage taxes and stamp duties on manifests must also fall. The validity of such taxes is not before us for determination, and, therefore, we must decline to express any opinion thereon, and yet it may be not improper to say that even if the suggested result should follow it furnishes no reason for not recognizing that which in our judgment is the true construction of the constitutional limitation. Mingling in one statute two or three unconstitutional taxes cannot be held operative to validate either one, and if the reasoning we have stated and followed in reaching the conclusion in this case shall also lead to the result that such taxes are

invalid, it of itself does not weaken the force of the reasoning or justify us in departing from its conclusions. But we may be permitted to suggest, without deciding, that there may be a valid difference as indicated by the decisions of this court in respect to interstate commerce. It has been distinctly held that no State could by a license or otherwise impose a burden on the business of interstate commerce. *Pickard* v. *Pullman Southern Car Co.*, 117 U. S. 34, and cases cited in the opinion. And yet that decision was followed by decisions that it might tax the vehicles and property employed in interstate commerce so long and so far as they were a part of the property of the State. *Pullman's Palace Car Co.* v. *Pennsylvania*, 141 U. S. 18, and cases cited in the opinion. This difference may have significance in respect to these other taxes. As heretofore said, we do not decide the question, but only make these suggestions to indicate that the matter has been considered.

Another matter pressed upon our attention, which deserves and has received careful consideration, is the practical construction of this constitutional provision by legislative action. On July 6, 1797, an act was passed entitled "An act laying duties on stamped vellum, parchment and paper," (1 Stat. 527,) which contained this clause: ·

"Any note or bill of lading, for any goods or merchandise to be exported, if from one district to another district of the United States, not being in the same State, ten cents; if to be exported to any foreign port or place, twenty-five cents," etc. p. 528.

This was changed by the act of February 28, 1799, 1 Stat. 622, but only as to the amount. On April 6, 1802, 2 Stat. 148, a repealing act was passed. Again, on July 1, 1862, 12 Stat. 432, a similar stamp duty was imposed on foreign bills of lading, which was continued by the act of June 30, 1864, 13 Stat. 223, 291, finally repealed by the act of June 6, 1872, 17 Stat. 230, 256; and then followed the act in question. In *Knowlton* v. *Moore, supra*, in which the inheritance tax was considered, the significance of this practical construction by legislative action was referred to, and on pages 56, 57, we said:

"The act of 1797, which ordained legacy taxes, was adopted

at a time when the founders of our Government and framers of
our Constitution were actively participating in public affairs,
thus giving a practical construction to the Constitution which
they had helped to establish.   Even the then members of the
Congress who had not been delegates to the convention which
framed the Constitution must have had a keen appreciation of
the influences which had shaped the Constitution and the re-
strictions which it embodied, since all questions which related
to the Constitution and its adoption must have been, at that
early date, vividly impressed on their minds.   It would, under
these conditions, be indeed surprising if a tax should have been
levied without question upon objects deemed to be beyond the
grasp of Congress because exclusively within state authority.
It is, moreover, worthy of remark that similar taxes have at
other periods and for a considerable time been enforced; and
although their constitutionality was assailed on other grounds
held unsound by this court, the question of the want of author-
ity of Congress to levy a tax on inheritances and legacies was
never urged against the acts in question."

And again, when the construction of the uniformity clause
was being considered (p. 92):

"But one of the most satisfactory answers to the argument
that the uniformity required by the Constitution is the same as
the equal and uniform clause which has since been embodied
in so many of the state constitutions, results from a review of
the practice under the Constitution from the beginning.   From
the very first Congress down to the present date, in laying duties,
imposts and excises, the rule of inherent uniformity, or, in other
words, intrinsically equal and uniform taxes, has been disre-
garded, and the principle of geographical uniformity consist-
ently enforced."

That was not the first case in which this matter has been con-
sidered by this court.   On the contrary, it has been often pre-
sented.   See in the margin a partial list of cases in which the
subject has been discussed.[1]   An examination of the opinions

---

[1] *Stuart* v. *Laird*, 1 Cranch, 299; *Martin* v. *Hunter's Lessee*, 1 Wheat.
304, 351; *Cohens* v. *Virginia*, 6 Wheat. 264, 418; *Edwards's Lessee* v. *Darby*,

in those cases will disclose that they may be grouped in three classes : First, those in which the court, after seeking to demonstrate the validity or the true construction of a statute, has added that if there were doubt in reference thereto the practical construction placed by Congress, or the department charged with the execution of the statute, was sufficient to remove the doubt; second, those in which the court has either stated or assumed that the question was doubtful, and has rested its determination upon the fact of a long continued construction by the officials charged with the execution of the statute; and, third, those in which the court, noticing the fact of a long continued construction, has distinctly affirmed that such construction cannot control when there is no doubt as to the true meaning of the statute.

The first class is illustrated by *Cohens* v. *Virginia*, 6 Wheat. 264. There the question presented was the jurisdiction of this court over proceedings by indictment in a state court for a violation of a state statute. In an elaborate argument Chief Justice Marshall sustained the jurisdiction, and then added (p. 418):

"Great weight has always been attached, and very rightly attached, to contemporaneous exposition. No question, it is

12 Wheat. 206, 210 ; *United States* v. *State Bank of North Carolina*, 6 Pet. 29, 39 ; *United States* v. *Macdaniel*, 7 Pet. 1; *Prigg* v. *Commonwealth of Pennsylvania*, 16 Pet. 539; *Union Insurance Company* v. *Hoge*, 21 How. 35, 66; *United States* v. *Alexander*, 12 Wall. 177, 181; *Peabody* v. *Stark*, 16 Wall. 240, 243; *Dollar Savings Bank* v. *United States*, 19 Wall. 227, 237; *Smythe* v. *Fiske*, 23 Wall. 374, 382; *United States* v. *Moore*, 95 U. S. 760, 763; *Swift Company* v. *United States*, 105 U. S. 691, 695; *Hahn* v. *United States*, 107 U. S. 402, 406; *United States* v. *Graham*, 110 U. S. 219, 221; *Lithographic Company* v. *Sarony*, 111 U. S. 53, 57; *Brown* v. *United States*, 113 U. S. 568, 571; *Cooper Manufacturing Company* v. *Ferguson*, 113 U. S. 727, 733; *The Laura*, 114 U. S. 411, 416; *United States* v. *Philbrick*, 120 U. S. 52, 59; *United States* v. *Hill*, 120 U. S. 169, 182; *United States* v. *Johnston*, 124 U. S. 236, 253; *Robertson* v. *Downing*, 127 U. S. 607, 613; *Merritt* v. *Cameron*, 137 U. S. 542, 552; *Schell's Executors* v. *Fauché*, 138 U. S. 562, 570; *United States* v. *Alabama R. R. Co.*, 142 U. S. 615, 621; *McPherson* v. *Blacker*, 146 U. S. 1; *United States* v. *Tanner*, 147 U. S. 661, 663; *United States* v. *Union Pacific Ry. Co.*, 148 U. S. 562, 572; *United States* v. *Alger*, 152 U. S. 384, 397; *Webster* v. *Luther*, 163 U. S. 331, 342; *Wisconsin Central R. R. Co.* v. *United States*, 164 U. S. 190, 205; *Hewitt* v. *Schultz*, 180 U. S. 139–156.

believed, has arisen to which this principle applies more unequivocally than to that now under consideration."

And in support of that referred to the writings in The Federalist, which were presented before the adoption of the Constitution, and were generally recognized as powerful arguments in its favor; also to the Judiciary Act of 1789, 1 Stat. 73, the decisions of this court and the assent of the courts of several States thereto, saying (p. 421):

"This concurrence of statesmen, of legislators, and of judges in the same construction of the Constitution may justly inspire some confidence in that construction."

Again, in *United States* v. *State Bank of North Carolina*, 6 Pet. 29, 39, Mr. Justice Story, in like manner, said:

"It is not unimportant to state, that the construction which we have given to the terms of the act, is that which is understood to have been practically acted upon by the Government, as well as by individuals, ever since its enactment. Many estates, as well of deceased persons, as of persons insolvent who have made general assignments, have been settled upon the footing of its correctness. A practice so long and so general would, of itself, furnish strong grounds for a liberal construction, and could not now be disturbed without introducing a train of serious mischiefs. We think the practice was founded in the true exposition of the terms and intent of the act, but if it were susceptible of some doubt, so long an acquiescence in it would justify us in yielding to it as a safe and reasonable exposition."

In the second class may be placed *Stuart* v. *Laird*, 1 Cranch, 299; *Burrow Lithographic Company* v. *Sarony*, 111 U. S. 53, in which last case Mr. Justice Miller, speaking for the court, used this language (p. 57):

"The construction placed upon the Constitution by the first act of 1790, and the act of 1802, by the men who were contemporary with its formation, many of whom were members of the convention which framed it, is of itself entitled to very great weight, and when it is remembered that the rights thus established have not been disputed during a period of nearly a century, it is almost conclusive."

See also *The Laura*, 114 U. S. 411; *United States* v. *Phil-*

*brick*, 120 U. S. 52, 59 ; *United States* v. *Hill*, 120 U. S. 169, 182 ; *Robertson* v. *Downing*, 127 U. S. 607, 613, and *Schell's Executors* v. *Fauché*, 138 U. S. 562, 572, in which it was said:

"In all cases of ambiguity, the contemporaneous construction, not only of the courts, but of the departments, and even of the officials whose duty it is to carry the law into effect, is universally held to be controlling."

The third class is the largest. While the language used by the several Justices announcing the opinions in these cases is not the same, the thought is alike. Thus, in *Swift Company* v. *United States*, 105 U. S. 691, 695, Mr. Justice Matthews said:

"The rule which gives determining weight to contemporaneous construction, put upon a statute, by those charged with its execution, applies only in cases of ambiguity and doubt."

In *United States* v. *Graham*, 110 U. S. 219, 221, Chief Justice Waite thus stated the law: ·

"Such being the case it matters not what the practice of the departments may have been or how long continued, for it can only be resorted to in aid of interpretation, and 'it is not allowable to interpret what has no need of interpretation.' If there were ambiguity or doubt, then such a practice, begun so early and continued so long, would be in the highest degree persuasive, if not absolutely controlling in its effect. But with language clear and precise, and with its meaning evident, there is no room for construction, and consequently no need of anything to give it aid. The cases to this effect are numerous."

In *United States* v. *Tanner*, 147 U. S. 661, 663, it was said by Mr. Justice Brown :

"If it were a question of doubt, the construction given to this clause prior to October, 1885, might be decisive; but, as it is clear to us that this construction was erroneous, we think it is not too late to overrule it. *United States* v. *Graham*, 110 U. S. 219 ; *Swift Company* v. *United States*, 105 U. S. 691. It is only in cases of doubt that the construction given to an act by the department charged with the duty of enforcing it becomes material."

In *United States* v. *Alger*, 152 U. S. 384, 397, Mr. Justice Gray used this language :

" If the meaning of that act were doubtful, its practical construction by the Navy Department would be entitled to great weight. But as the meaning of the statute, as applied to these cases, appears to this court to be perfectly clear, no practice inconsistent with that meaning can have any effect."

In *Webster* v. *Luther*, 163 U. S. 331, 342, Mr. Justice Harlan stated the rule in these words:

" The practical construction given to an act of Congress, fairly susceptible of different constructions, by one of the executive departments of the Government, is always entitled to the highest respect, and in doubtful cases should be followed by the courts, especially when important interests have grown up under the practice adopted. *Bate Refrigerating Co.* v. *Sulzberger*, 157 U. S. 1, 34; *United States* v. *Healey*, 160 U. S. 136, 141. But this court has often said that it will not permit the practice of an executive department to defeat the obvious purpose of a statute."

From this *résumé* of our decisions it clearly appears that practical construction is relied upon only in cases of doubt. We have referred to it when the construction seemed to be demonstrable, but then only in response to doubts suggested by counsel. Where there was obviously a matter of doubt, we have yielded assent to the construction placed by those having actual charge of the execution of the statute, but where there was no doubt we have steadfastly declined to recognize any force in practical construction. Thus, before any appeal can be made to practical construction, it must appear that the true meaning is doubtful.

We have no disposition to belittle the significance of this matter. It is always entitled to careful consideration and in doubtful cases will, as we have shown, often turn the scale; but when the meaning and scope of a constitutional provision are clear, it cannot be overthrown by legislative action, although several times repeated and never before challenged. It will be perceived that these stamp duties have been in force during only three periods: First, from 1797 to 1802; second, from 1862 to 1872; and, third, commencing with the recent statute of 1898. It must be borne in mind also in respect to this mat-

ter that during the first period exports were limited, and the amount of the stamp duty was small, and that during the second period we were passing through the stress of a great civil war or endeavoring to carry its enormous debt; so that it is not strange that the legislative action in this respect passed unchallenged. Indeed, it is only of late years, when the burdens of taxation are increasing by reason of the great expenses of government, that the objects and modes of taxation have become a matter of special scrutiny. But the delay in presenting these questions is no excuse for not giving them full consideration and determining them in accordance with the true meaning of the Constitution.

Without enlarging further on these matters, we are of opinion that a stamp tax on a foreign bill of lading is in substance and effect equivalent to a tax on the articles included in that bill of lading, and, therefore, a tax or duty on exports, and in conflict with the constitutional prohibition. The judgment of the District Court will be reversed and the case remanded with instructions to grant a new trial.

MR. JUSTICE HARLAN, (with whom concurred MR. JUSTICE GRAY, MR. JUSTICE WHITE and MR. JUSTICE McKENNA,) dissenting.

By the act of June 13, 1898, c. 448, imposing certain stamp duties, it was declared that there should be levied, collected and paid the sum of *ten* cents "*for* and *in respect of* the *vellum, parchment or paper* upon which . . . shall be written or printed by any person or persons or party who shall make, sign or issue the same, or for whose use or benefit the same shall be made, signed or issued, . . . bills of lading or receipt (other than charter party) for any goods, merchandise or effects, to be exported from a port or place in the United States to any foreign port or place. . . . *Provided*, That the stamp duties imposed by the foregoing Schedule on manifests, bills of lading and passage tickets shall not apply to steamboats or other vessels plying between ports of the United States and ports in British North America." 30 Stat. 448, 451, 458, 459, 462, §§ 6 and 24, Schedule A.

It is contended that this stamp duty is forbidden by the clause of the Constitution declaring that " no tax or duty shall be laid on *articles* exported from any State," art. I, § 9 ; and that the stamp duty here in question was, within the meaning of that instrument, a tax or duty on the wheat received by the Northern Pacific Railway Company to be carried from Minnesota to Liverpool, and for which the company issued its bill of lading.

We are of opinion that this contention cannot be sustained without departing from a rule of constitutional construction by which this court has been guided since the foundation of the Government.    Let us see to what extent Congress has exercised the power now held not to belong to it under the Constitution.

As early as July 6, 1797, Congress passed an act entitled " An act laying duties on stamped vellum, parchment and paper." By the first section of that act it was provided that from and after the 31st day of December thereafter there should be "levied, collected and paid throughout the United States the several stamp duties following, to wit : For every skin or piece of vellum, or parchment, or sheet or piece of paper upon which shall be written or printed any or either of the instruments or writings following, to wit :  .  .  .   any note or bill of lading for any goods or merchandise  .  .  .   to be exported to any foreign port or place, twenty-five cents." 1 Stat. 527, 528, c. 11, § 1.   The same act provided : " That if any person or persons shall write or print, or cause to be written or printed upon any unstamped vellum, parchment or paper, (with intent fraudulently to evade the duties imposed by this act), any of the matters and things for which the said vellum, parchment or paper is hereby charged to pay any duty, or shall write or print, or cause to be written or printed any matter or thing, upon any vellum, parchment or paper, that shall be marked or stamped for any lower duty than the duty by this act payable, such person so offending shall for every such offence forfeit the sum of one hundred dollars." 1 Stat. 527, 528, c. 11, § 13.

By an act approved December 15, 1797, c. 1, it was provided that the duties prescribed by the act of July 6, 1797, should be levied, collected and paid from and after June 30, 1798, and not before.    1 Stat. 536.

The above act of July 6, 1797, was amended in certain particulars by an act approved March 19, 1798, c. 20, by which certain provisions were made for furnishing the vellum, parchment or paper required by the former act to be stamped and marked. 1 Stat. 545.

It not having occurred to any of the great statesmen and jurists who were connected with the early history of the Government that enactments such as that of July 6, 1797, violated the Constitution, Congress passed another act on the 28th day of February, 1799, c. 17, imposing a duty of ten cents "on every skin or piece of vellum or parchment on which shall be written or printed any or either of the instruments following, to wit: . . . Any note or bill of lading, or writing or receipt in the nature thereof, for any goods or merchandise . . . to be exported to any foreign port or place." 1 Stat. 622.

Congress, still supposing that it was acting within the limits of its powers under the Constitution, again, by the act of April 23, 1800, c. 31, amended and extended that of July 6, 1797. By the latter act a general stamp office was established, and provision was made, among other things, for the punishment, by fine and imprisonment, of those who, with the intent to defraud the United States of any of the duties laid by the original act of 1797, counterfeited or caused to be forged or counterfeited any vellum, parchment or paper provided for by Congress under that act. 2 Stat. 40, 42. The act of April 23, 1800, was amended by an act passed March 3, 1801, c. 19, by which it was provided that deeds, instruments or writings, issued without being stamped, could be thereafter stamped and become valid and available as if they had been originally stamped as required by law. 2 Stat. 109.

By an act approved April 6, 1802, c. 17, internal duties on "stamped vellum, parchment and paper" were discontinued—for the reason, doubtless, that the further imposition of such duties was unnecessary. 2 Stat. 148.

As late as March 3, 1823, Congress passed a general statute in execution of the act of April 23, 1800, establishing a general stamp office. 3 Stat. 779.

By an act approved July 1, 1862, c. 119, Congress provided

JUSTICES HARLAN, GRAY, WHITE and McKENNA, dissenting.

that there should be levied, collected and paid a stamp duty of ten cents " for and in respect of the vellum, parchment or paper " upon which was written or printed any " bill of lading or receipt (other than charter party) for any goods, merchandise or effects, to be exported from a port or place in the United States to any foreign port or place." 12 Stat. 432, 475, 479, 480, §§ 94, 110. By the act of June 30, 1864, c. 173, the. stamp duties provided by the act of July 1, 1862, were continued in force until August 1, 1864, and it was provided that from and after the latter date there should be levied, collected and paid a stamp duty of ten cents " for and in respect of the vellum, parchment or paper upon which shall be written or printed " any " bill of lading or receipt (other than charter party) for any goods, merchandise or effects, to be exported from a port or place in the United States to any foreign port or place." 13 Stat. 223, 291, 292, 298, §§ 151, 170, Schedule B. But by an act approved June 6, 1872, c. 315, all the taxes imposed under and by virtue of Schedule B of section 170 of the act of June 30, 1864, and the several acts amendatory thereof, were abrogated from and after October 1, 1872, excepting only the tax of two cents on bank checks, drafts or orders. 17 Stat. 230, 256.

We have referred somewhat in detail to the above enactments for the purpose of bringing out clearly the fact that stamp duties were imposed specifically for and in respect of the vellum, parchment or paper upon which was written or printed a bill of lading for goods or merchandise to be exported to foreign countries, and had no reference to the kind, quality or value of the property covered by such bill of lading. Congress *ex industria* declared in each act that the tax was for and in respect of the vellum, parchment or paper upon which the bills of lading were written or printed. This fact plainly distinguishes the present case from *Almy* v. *State of California,* 24 How. 169, which involved the validity, under the Constitution of the United States, of a statute of California, passed April 26, 1858, imposing a stamp tax on bills of lading for the transportation from that State, to any port or place without the State, of any quantity of gold or silver coin, in whole or in part, gold dust, or gold or silver in bars or other form. This court, after observing that

a tax laid on the gold or silver exported from California was forbidden by the clause declaring that " no State shall, without the consent of Congress, lay any imposts or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws," said : " In the case now before the court, the intention to tax the export of gold and silver, in the form of a tax on the bill of lading, is too plain to be mistaken. The duty is imposed only on bills of lading of gold and silver, and not upon articles of any other description. And we think it is impossible to assign a reason for imposing the duty upon the one and not upon the other, unless it was intended to lay a tax upon the gold and silver exported, while all the other articles were exempted from the charge. If it was intended merely as a stamp duty on a particular description of paper, the bill of lading of any other cargo is in the same form, and executed in the same manner and for the same purposes, as one for gold and silver, and so far as the instrument of writing was concerned, there could hardly be a reason for taxing one and not the other. In the judgment of this court the state tax in question is a duty upon the export of gold and silver, and consequently repugnant to the clause in the Constitution hereinbefore referred to." This interpretation was demanded by the words of the statute of California which provided: "The following duty or stamp tax is hereby imposed on every sheet or piece of paper, parchment or other material, upon which may be written, printed, engraved, or lithographed, or other means of designation, of either of the following-described instruments, to wit: Any bill of lading, contract, agreement, or obligation for the transportation or conveyance from any point or place in this State, to any point or place without the limits of this State, of any sum, amount or quantity of gold or silver coin, in bars or other form, by or between any person or persons, firm or firms, corporation or corporations, or other associations, either as principal or agent, or attorney or consignee, or consignor, to wit: *for one hundred dollars, thirty cents ; and all sums over one hundred dollars, a stamp tax or duty of one-fifth of one per cent upon the amount or value thereof*, the payment whereof to be included in the bill of lading, contract, or agreement, or, ob-

ligation for the transportation or conveyance thereof, as in this section provided, having attached thereto or stamped thereon a stamp or stamps expressing in value the amount of such tax duty," etc. Stat. Cal. 1858, p. 305 ; Stat. Cal. 1857, p. 304.

The difference between the California statute and the act of Congress is manifest. By the former the amount of the tax upon bills of lading depended upon the value of the gold or silver specified in them and exported, while the latter imposed a tax of only ten cents on the vellum, parchment or paper upon which was written or printed a bill of lading for property to be exported, without regard to its quantity or value. If Congress had graduated the stamp duty according to the quantity or value of the articles exported, there might have been ground for holding that the purpose and the necessary result was to tax the property and not the vellum, parchment or paper on which the bill of lading was written or printed.

This rule of interpretation was recognized in *Pace* v. *Burgess, Collector*, 92 U. S. 372, 375. That case arose under the act of July 20, 1868, c. 176, imposing duties on distilled spirits and tobacco, and for other purposes, and which provided that " all tobacco and snuff intended for export, before being removed from the manufactory, shall have affixed to each package an engraved stamp indicative of such intention, to be provided and furnished to the several collectors, as in the case of other stamps, and to be charged to them and accounted for in the same manner ; and for the expense attending the providing and affixing such stamps, twenty-five cents for each package to be stamped shall be paid to the collector on making the entry for such transportation." 15 Stat. 125, 158, § 74. The contention. was that the statute imposed a tax or duty in violation of the constitutional prohibition of taxes or duties " on articles exported from any State." Art. 1, § 9. This court overruled that contention upon the ground that it was apparent from the statute that " the stamp was intended for no other purpose than to separate and identify the tobacco which the manufacturer desired to export, and thereby, instead of taxing it, to relieve it from the taxation to which other tobacco was subjected. It was a means devised to prevent fraud, and to secure the faith-

ful carrying out of the declared intent with regard to the tobacco so marked. The payment of twenty-five cents or of ten cents for the stamp was no more a tax on the export than was the fee for clearing the vessel in which it was transported, or for making out and certifying the manifest of the cargo." The court added—and this is important in its bearing on the case before us: " It [the stamp] bore *no proportion whatever to the quantity or value of the package on which it was affixed*. These were unlimited, except by the discretion of the exporter or the convenience of handling. The large amount paid for such stamps by the plaintiff only shows that he was carrying on an immense business." As in *Pace* v. *Burgess, Collector*, so in the present case the stamp duty imposed was without any reference to the quantity or value of the property.

In our judgment, the small stamp duty imposed by the act of 1898 specifically upon the vellum, parchment or paper upon which was written or printed a bill of lading for property, of whatever value, intended for export, cannot be regarded as a duty on the property itself.

It is said that the power to tax is the power to destroy, and that if Congress can impose a stamp tax of ten cents upon the vellum, parchment or paper on which is written a bill of lading for articles to be exported from a State, it could as well impose a duty of five thousand dollars and thereby indirectly tax the articles intended for export. That conclusion would by no means follow. A *stamp* duty has now, and has had for centuries, a well-defined meaning. It has always been distinguished from an ordinary tax measured by the value or kind of the property taxed. If Congress, in respect of a bill of lading for articles to be exported, had imposed a tax of five thousand dollars for and in respect of the vellum, parchment or paper upon which such bill was written, the courts, looking beyond form and considering substance, might well have held that such an act was contrary to the settled theory of stamp tax laws, and that the purpose and necessary operation of such legislation was, in violation of the Constitution, to tax the articles specified in such bill and not to impose simply a stamp duty. Here, the small duty imposed, without reference to the kind, quantity or value

of the articles exported, renders it certain that when Congress imposed such duty specifically on the vellum, parchment or paper upon which the bill of lading was written or printed, it meant what it so plainly said ; and no ground exists to impute a purpose by indirection to tax the articles exported.

There is another view of this case which presents considerations of a serious character.   In the opinion just rendered it is conceded that a stamp tax on vellum, parchment or paper on which is printed or written a bill of lading of goods to be shipped out of the United States, could be sustained, if regard be had to the practice of the Government since its organization.    But that practice, covering more than a century, must, it seems, go for naught.

In *Stuart* v. *Laird*, 1 Cranch, 299, 309, (1803) the question arose whether the Justices of this court had the right, although authorized by an act of Congress, to sit as Circuit Judges, not having been appointed as such nor having any distinct commissions for that purpose.   This court, speaking by Mr. Justice Patterson, said : " To this objection, which is of recent date, it is sufficient to observe, that *practice and acquiescence under it* for a period of several years, commencing with the organization of the judicial system, affords an irresistible answer, and has indeed *fixed the construction.*   It is a contemporary interpretation of the most forcible nature.   This practical exposition is too strong and obstinate to be shaken or controlled.   Of course, the question *is at rest,* and ought not now to be disturbed."

In *Prigg* v. *Pennsylvania*, 16 Pet. 541, 608, 621, this court, speaking by Mr. Justice Story, after referring to the section of the act of February 12, 1793, requiring a certificate to be given, under certain circumstances, to the owner of a fugitive slave apprehended under that act, said : " So far as the judges of the courts of the United States have been called upon to enforce it and to grant the certificate required by it, it is believed that it has been uniformly recognized as a binding and valid law ; and as imposing a constitutional duty.   Under such circumstances, if the question were one of doubtful construction, such long acquiescence in it, such contemporaneous expositions of it, and such extensive and uniform recognition of its validity, would, in our

judgment, entitle the question to be considered at rest ; unless, indeed, the interpretation of the Constitution is to be delivered over to interminable doubt throughout the whole progress of legislation and of national operations.   Congress, the executive and the judiciary have, upon various occasions, acted upon this as sound and reasonable doctrine "—citing among other cases that of *Stuart* v. *Laird*, 1 Cranch, 299.

In *The Laura*, 114 U. S. 411, 416, in which the question arose as to the validity of an act of Congress approved March 3, 1797, 1 Stat. 506, c. 13, authorizing the Secretary of the Treasury to remit a forfeiture of property after final sentence of condemnation, this court said : " Touching the objection now raised as to the constitutionality of the legislation in question, it is sufficient to say, as was said in an early case, that the practice and acquiescence under it, ' commencing with the organization of the judicial system, affords an irresistible answer, and has indeed fixed the construction.   It is a contemporary interpretation of the most forcible nature.   This practical exposition is too strong and obstinate to be shaken or controlled.   Of course, the question is at rest, and ought not now to be disturbed.'   *Stuart* v. *Laird*, 1 Cranch, 308.   The same principle was announced in *Burrow Lithographic Co.* v. *Sarony*, 111 U. S. 53, 57, where a question arose as to the constitutionality of certain statutory provisions reproduced from some of the earliest statutes enacted by Congress.   The court said : ' The construction placed upon the Constitution by the first act of 1790, and the act of 1802, by the men who were contemporary with its formation, many of whom were members of the Convention which framed it, is, of itself, entitled to very great weight ; and when it is remembered that the rights thus established have not been disputed during a period of nearly a century, it is [almost] *conclusive.*'"   This quotation in *The Laura* from the opinion in *Sarony's* case was defective in that it omitted, by mistake in printing, the word " almost " before " conclusive."   But the error does not affect the substance of the decision rendered, as the court, in the case of *The Laura*, approved and reaffirmed what was said in *Stuart* v. *Laird*.

In *Schell's Executors* v. *Fauché*, 138 U. S. 562, this court,

speaking by Mr. Justice Brown, cited with approval what is above quoted from *Stuart* v. *Laird*, adding: "In all cases of ambiguity, the contemporaneous construction, not only of the courts, but of the departments, and even of the officers whose duty it is to carry the law into effect, is universally held to be *controlling.*"

In *McPherson* v. *Blacker*, 146 U. S. 1, 27, this court, speaking by the present Chief Justice, said: "The framers of the Constitution employed words in their natural sense; and where they are plain and clear, resort to collateral aids to interpretation is unnecessary and cannot be indulged in to narrow or enlarge the text; but where there is ambiguity or doubt, or where two views may well be entertained, contemporaneous and subsequent practical construction are entitled to the greatest weight. Certainly, plaintiffs in error cannot reasonably assert that the clause of the Constitution under consideration so plainly sustains their position as to entitle them to object that contemporaneous history and practical construction are not to be allowed their legitimate force, and, conceding that their argument inspires a doubt sufficient to justify resort to the aids of interpretation thus afforded, we are of opinion that such doubt is thereby resolved against them, the *contemporaneous practical exposition of the Constitution being too strong and obstinate to be shaken or controlled. Stuart* v. *Laird*, 1 Cranch, 299, 309."

Cases almost without number could be referred to in which the same principles of constitutional construction are announced as in the cases above cited. In the latest case—*Knowlton* v. *Moore*, 178 U. S. 41, 56—this court had occasion in its review of taxing legislation by Congress, to refer to the act of July 6, 1797, the very act in which Congress first imposed a stamp duty on vellum, parchment or paper upon which was written a bill of lading for articles to be exported. Touching the objection that Congress could not constitutionally impose, as by that act was imposed, a tax on inheritances or legacies, this court, speaking by Mr. Justice White, said: "It is to be remarked that this proposition denies to Congress the right to tax a subject-matter which was conceded to be within the scope of its power very early in the history of the Government. The act of 1797,

which ordained legacy taxes, was adopted at a time when the founders of our Government and framers of our Constitution were actively participating in public affairs, thus giving a practical construction to the Constitution which they had helped to establish. Even the then members of the Congress who had not been delegates to the Convention which framed the Constitution, must have had a keen appreciation of the influences which had shaped the Constitution and the restrictions which it embodied, since all questions which related to the Constitution and its adoption must have been, at that early date, vividly impressed on their minds. It would, under these conditions, be indeed surprising if a tax should have been levied without question upon objects deemed to be beyond the grasp of Congress because exclusively within state authority."

Many cases have been cited which hold that the uniform, contemporaneous construction by *executive* officers charged with the enforcement of a *doubtful* or *ambiguous* law is entitled to great weight and should not be overturned unless it be plainly or obviously erroneous. If such respect be accorded to the action of mere executive officers, how much greater respect is due to the legislative department when it has at different periods in the history of the country exercised a power as belonging to it under the Constitution, and no one in the course of a century questioned the existence of the power so exercised. Besides, we have here a question of the constitutional power of Congress under the Constitution, and not a question relating merely to the practice of executive officers acting under a law susceptible of different interpretations. No one of the acts of Congress imposing a stamp duty on the vellum, parchment or paper on which a bill of lading of articles to be exported was written, can be classed among laws that are doubtful or ambiguous in their meaning. No person, however skilful in the use of words, who attempts to frame a statute imposing a stamp duty, pure and simple, on such vellum, parchment or paper, could possibly employ language expressing that thought more distinctly than Congress has done in the several acts relating to stamp duties of that character. The words of those acts are clear, and are capable of but one construction; and the court determines the

JUSTICES HARLAN, GRAY, WHITE and MCKENNA, dissenting.

case upon the ground alone of want of power in Congress to impose the stamp duty in question.

Without further discussion or citation of authorities, we submit that the denial, at this late day, of the power of Congress to impose what is strictly a stamp duty on the vellum, parchment or paper upon which is written or printed a bill of lading for goods to be exported to a foreign port or place, involves not only a departure from canons of constitutional construction by which it has been controlled for more than a century, but, in the words of *Prigg* v. *Commonwealth*, delivers the interpretation of the Constitution "over to interminable doubt throughout the whole progress of legislation and of national operations." Practically no weight has been given in the opinion just filed to the fact that the power now denied to Congress has been exercised since the organization of the Government without any suggestion or even intimation by a single jurist or statesman during all that period that the Constitution forbade its exercise. It is said that the question of power never was presented for judicial determination prior to the present case, and therefore this court is at liberty to determine the matter as if now for the first time presented. But the answer to that suggestion is that, in view of the frequent legislation by Congress and its enforcement for nearly a century, the question must have arisen if it had been supposed by any one that such legislation infringed the constitutional rights of the citizen. Within the rule announced in *Stuart* v. *Laird*, and in other cases, the question should be considered at rest.

In view of the importance of the case, we have deemed it appropriate to state the reasons of our dissent from the opinion and judgment just rendered.