PITTSBURGH MELTING CO. v. BALTIMORE & O. R. CO. et al.

(District Court, W. D. Pennsylvania. January 17, 1916.)

No. 12.

1. FOOD ⬤⇒3—MEAT INSPECTION—STATUTORY PROVISIONS—APPLICATION.

Act June 30, 1906, c. 3913, 34 Stat. 674, for the purpose of preventing the use in interstate or foreign commerce of meat and meat food products unfit for human food, provides for the examination and inspection of animals before being allowed to enter into any slaughtering or similar establishment in which they are to be slaughtered, and the meat and meat food products thereof used in interstate or foreign commerce, and excludes from such commerce meat food products not so inspected and passed. Plaintiff manufactured tallow oil, used in making soap, glycerine, dynamite, and for other industrial and commercial purposes from the fat of slaughtered beef cattle. It was made from all parts of the animal, and not from the fat from particular parts, as is used in oleo oil, intended to be used in the manufacture of oleomargarine. Plaintiff's tallow oil was not sold to manufacturers of oleomargarine, and was not used or intended to be used in such manufacture, though it might be so used, and when shipped was conspicuously marked with the words "Tallow Oil" and "Inedible." Held, that plaintiff and its product were not within the provisions of the act.

[Ed. Note.—For other cases, see Food, Cent. Dig. §§ 3, 4; Dec. Dig. ⬤⇒3.]

2. STATUTES ⬤⇒219—CONSTRUCTION—PRACTICAL CONSTRUCTION.

When the intention of a statute is doubtful, the construction placed upon it for many years by those charged with executing its provisions may be resorted to in aid of its true construction.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. §§ 296, 297; Dec. Dig. ⬤⇒219.]

⬤⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. FOOD ⟨⇒3—MEAT INSPECTION—DEPARTMENTAL REGULATIONS—VALIDITY.

Act June 30, 1906, relative to the inspection of meat and meat products. authorizes the Secretary of Agriculture to make such rules and regulations as are necessary for the efficient execution of its provisions. Thereunder the Secretary adopted regulations specifying as products subject to the act and such regulations carcasses and food and meat products derived from cattle, sheep, swine, and goats which are "capable of being used as food by man," and also required shippers of inedible foods to furnish a certificate certifying among other facts that the fat is not capable of being used as food by man. *Held*, that the Secretary exceeded his authority in making such regulations, as the power to make rules and regulations for the efficient execution of the provisions of the act gave him no power to add any provision to the act, and by the terms of the statute the meat and meat food products subject thereto are articles eaten by man, proper for human consumption, and fit for human food.

[Ed. Note.—For other cases, see Food, Cent. Dig. §§ 3, 4; Dec. Dig. ⟨⇒3.]

4. CONSTITUTIONAL LAW ⟨⇒62—LEGISLATIVE POWERS—DELEGATION TO EXECUTIVE OFFICERS.

Congress cannot delegate legislative power to any executive officer.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 94-102; Dec. Dig. ⟨⇒62.]

In Equity. Suit by the Pittsburgh Melting Company against the Baltimore and Ohio Railroad Company and another. Decree for plaintiff.

Reed, Smith, Shaw & Beal, of Pittsburgh, Pa., for plaintiff.

Wm. Watson Smith, of Pittsburgh, Pa., for defendant Baltimore & O. R. Co.

E. Lowry Humes, U. S. Dist. Atty., of Pittsburgh, Pa., for defendant Totten.

ORR, District Judge. This suit in equity is before the court for decision after trial. The controversy involves a construction of that portion of the act of Congress entitled "An act making appropriations for the Department of Agriculture for the fiscal year ending June 30, 1907," approved June 30, 1906 (34 Stat. 674), which is commonly known as the Meat Inspection Amendment. Particularly it involves the question whether the plaintiff and the plaintiff's products are within the provisions of that act, and the question whether or not the Secretary of Agriculture has not exceeded his power in the adoption of certain new regulations intended to become effective on November 1, 1914. The immediate reason for filing the bill, as appears in the testimony, was the refusal by the Baltimore & Ohio Railroad Company to accept a shipment of tallow oil, because of notice to it by the defendant C. E. Totten, who was an inspector of the Bureau of Animal Industry of the Department of Agriculture, that the shipment offered by the plaintiff was not accompanied by a certificate in the form required by the regulations of November 1, 1914. This brief statement of the case was supported by the evidence at the trial from which are found the following facts:

[1] The plaintiff is a corporation of Pennsylvania, and owns and operates a plant for the manufacture of tallow oil (sometimes known as "oleo oil"), stearine, tallow, cracklings, stock, and grease in the city of Pittsburgh. It and its predecessors have been in business for more than 78 years. Its plant is connected by means of a railroad siding with the railroad of the defendant railroad company. The defendant railroad company is a corporation of the state of Maryland, and is a common carrier operating a line of railroad from various points, including, among others, from Pittsburgh to New York.

The plaintiff in 1881, or thereabouts, began the manufacture of oleomargarine, and continued in that business for five or six years, until the Legislature of Pennsylvania passed an act forbidding the manufacture of that substance. Plaintiff then ceased such manufacture, and thereafter operated its plant for the sole production of tallow or oleo oils, stearine, grease, tallow, cracklings, and stock, until the present time, using the machinery and equipment which had formerly been used by it in the manufacture of oleomargarine. Plaintiff does not sell or ship tallow or oleo oil, or any of its product, to any manufacturer or dealer in oleomargarine. It sells its product to manufacturers of soap, railroad companies, oil companies, steel companies, and others. Among its customers are Fairbanks & Co., W. & H. Walker, Colgate & Co., Swift & Co., the Westinghouse Air Brake Company, and various railroad companies. It ships a very large portion of its oil to Holland, Sweden, and other foreign countries.

Tallow or oleo oil is used not only for making soap, but for the production of glycerine, dynamite, and for other industrial and commercial purposes, including the manufacture of oleomargarine. It is the product of the fat of slaughtered beef cattle. The fat from which the plaintiff manufactures its oil is collected by its wagons, which visit various establishments in Allegheny county in the state of Pennsylvania, where beef cattle are slaughtered, or slaughtered animals are sold for meat. In the selection of these fats the plaintiff uses care and endeavors to select the best and purest. It uses the fat from all parts of the animal, and not the fat from particular parts only of the animal.

Oleo oil, which is intended to be used and is used in the manufacture of oleomargarine, is taken from particular parts of the carcass of the animal. Plaintiff's oil is not denatured. In plants which are inspected by inspectors appointed by the Department of Agriculture the process of denaturing is applied only to fats from condemned carcasses or fats which have fallen upon the floor, or perhaps have received some similar treatment. It is not practicable to denature tallow oil without impairing in some degree its value. While the evidence disclosed that its value for lubricating or illuminating purposes would not be affected, and perhaps for some of the coarser products or industrial operations, yet the court is satisfied that denaturing would affect the value of the oil for some of the purposes for which it is used, as in the manufacture of the finer soaps, tooth powders, and other pharmaceutical preparations. Neither oleo oil or tallow oil is sold by wholesale or retail grocers as a common article of food. While the evidence discloses the fact that some people have eaten both at

times, yet the fair conclusion from the testimony is that neither is a food. There was no evidence that any person had ever eaten any of plaintiff's product.

Plaintiff's oil is sold in the market as tallow oil. It is not sold in the market as oleo oil, at prices for which oleo oil sells. The prices for oleo oil are higher than the prices of tallow oil. The oil which plaintiff ships in interstate and foreign commerce is shipped in tierces, upon which, in addition to other markings, there are conspicuously placed the words "Tallow Oil" and "Inedible." There was no evidence in the case that plaintiff, by correspondence or otherwise, had at any time led any one to believe that the oil shipped by it was edible. Nor was there any evidence in the case that the plaintiff by subterfuge had at any time intended or attempted to evade the provisions of the law.

On or shortly after October 1, 1906, at which time the act of Congress now under consideration went into effect, the Department of Agriculture established at the plant of the plaintiff a system of inspection, whereby the entire operation of the plant was under the direction of an inspector assigned by the Bureau of Animal Industry, and thereafter for several years no operations were carried on at the plant of the plaintiff, except under the direct supervision of such inspector or inspectors. The mode of inspection during that period was as follows: The fat, after it was collected by wagons from various establishments in said county and delivered to plaintiff's plant, was inspected by the inspector by looking at it and smelling it. During the process of manufacturing the oil, the inspector made observations as to the temperature maintained in boiling the fat. When the oil was ready for shipment, the inspector further inspected it by tasting and smelling it. In addition to the inspection of the product itself, the inspector maintained a general supervision over the condition of the plant. Although plaintiff was advised that its plant was not subject to the provisions of the act of Congress, known as the Meat Inspection Amendment, it submitted to the same because the mode of inspection was deemed to be reasonable.

On or about May 10, 1907, the plaintiff was informed by the Bureau of Animal Industry that the Department of Agriculture had adopted a regulation whereby the mode of inspection theretofore maintained at plaintiff's plant would be discontinued, and whereby the plaintiff would not be permitted to use in the manufacture of tallow oil fat obtained from animals slaughtered at other than official establishments as determined by the regulations of the Department; such establishments being those at which official inspection under the act of Congress was maintained. The mode of inspection adopted by said Bureau, pursuant to said regulations was as follows: The driver of each wagon delivering fat to plaintiff's plant was required to obtain from each person from whom he obtained such fat and to deliver to the Bureau's inspector, a certificate stating that the fat was from the carcasses of beef cattle, which had been slaughtered at one of said official establishments. After the receipt of such information the plaintiff declined

to accede to the requirements of such new regulations, and thereupon the government withdrew its inspection from plaintiff's plant.

After the withdrawal of the inspection, the plaintiff shipped its product as "inedible" only, and so marked it in accordance with the rules and regulations adopted by the Secretary of Agriculture, which became effective April 1, 1908, and continued to ship its product until July, 1910, when an inspector notified the Baltimore & Ohio Railroad Company not to carry a certain shipment to one of plaintiff's customers in Rotterdam, Holland. Plaintiff then filed its bill in equity in this court against said railroad company and C. E. Totten, the government inspector, to restrain the enforcement of such notice, and to permit such shipment to go forward, which proceedings were subsequently discontinued by reason of the disposition of the indictment hereinafter mentioned.

At or about the same time that the bill in equity was filed the said government inspector caused an information to be made against the plaintiff and its general manager, upon which an indictment was obtained, charging them with unlawfully offering to said railroad company a meat food product for transportation from Pittsburgh and thence to Rotterdam. In that case a verdict was rendered for the defendants. From that time until January 15, 1915, the plaintiff, without complaint or objection on the part of the defendant Totten, or the said Bureau of Animal Industry, continued to make shipments of oil in interstate and foreign commerce, as an inedible fat, labeling each tierce containing the same with the word "Inedible," and delivering to the carrier certificates in the following form, namely:

Date .........., 19...

Name of common carrier   ......................................................
Consignor   ......................................................
Point of shipment   ......................................................
Consignee   ......................................................
Destination   ......................................................

I hereby certify that the following described fat is inedible and is not intended for food purposes, and that the said fat is of such a character or is intended for such a use that denaturing is impossible or will render said fat unavailable for the desired industrial use.

Kind of Product.                      Amount of Weight.

......................................   ......................................

......................................   ......................................

                               ......................................
                               (Signature of Shipper.)

                               ......................................
                         (Business Occupation of Shipper.)

                               ......................................
                               (Address of Shipper.)

On January 15, 1915, the plaintiff delivered to the defendant railroad company a certain car loaded with 100 tierces of said oil for shipment over the railway of said company to New York, in the state of New York, and thence by steamer sailing from the port of New York on January 28, 1915, to Rotterdam, Holland. The end of each of said tierces was painted white, and there was conspicuously stenciled or burned thereon "tallow Oil," the true name of the product contained therein, and also the word "Inedible."

On January 20, 1915, the plaintiff executed and delivered to said railroad company the following certificate:

January 15, 1915.

### Inedible Fat.

| | |
|---|---|
| Name of common carrier | Baltimore & Ohio Railroad Co. |
| Consignor | Pittsburgh Melting Company. |
| Point of shipment | Pittsburgh, Pa. |
| Consignee | Daniel Loeb. |
| Destination | Rotterdam, Holland. |

I hereby certify that the following described fat is inedible and is not intended for food purposes, and that the said fat is of such a character or is intended for such a use that denaturing is impossible or will render said fat unavailable for the desired industrial use.

| Kind of Product. | Amount and Weight. |
|---|---|
| ..........Tallow...........Bbls. | ....................Lbs. Gross. |
| 100 tcs. Tallow Oil | 44,300 lbs Gross. |

Name of Shipper:
Pittsburgh Melting Company.

The consignee named in the certificate last mentioned is a dealer in oils and grease. The defendant Totten notified the defendant company not to transport the shipment of oil described in said certificate. The defendant company immediately notified the plaintiff of the notice served on it by the defendant Totten. Thereupon the bill in this case was filed and a preliminary injunction was issued against the defendants.

In view of the facts thus found, are the plaintiff and its products within the provisions of the act of Congress? The act declares that its purpose is to prevent "the use, in interstate or foreign commerce as hereinafter provided, of meat and meat food products which are unsound, unhealthful, unwholesome or otherwise unfit for human food." It directs the Secretary of Agriculture to cause to be made by inspectors, appointed for that purpose, as thereinafter provided, "an examination and inspection of the carcasses and parts thereof of all cattle, sheep, swine and goats to be prepared for human consumption at any slaughtering, meat-canning, salting, packing, rendering or similar establishment in any state, territory, or the District of Columbia, for transportation or sale as articles of interstate or foreign commerce." It provides that "the carcasses and parts thereof of all such animals found to be sound, healthful, wholesome, and fit for human food, shall be marked, stamped, tagged or labeled as 'Inspected and Passed,'" and that "all carcasses and parts thereof of animals found to be unsound, unhealthful, unwholesome, or otherwise unfit for human food" shall be marked, stamped, tagged or labeled as "Inspected and Condemned." It authorizes the inspectors to reinspect carcasses or parts thereof to determine whether, since the first inspection, the same had become unsound, unhealthful, unwholesome, or in any way unfit for human food, and if upon such examination the carcasses or parts thereof should be found to be unsound, unhealthful, unwholesome, or otherwise unfit for human food, they are to be destroyed for food purposes by the said establishment, in the presence of the inspector. The act further provides "that for the purpose hereinbefore set forth, the Secretary of

Agriculture shall cause to be made, by inspectors appointed for that purpose, an examination and inspection of all meat food products prepared for interstate or foreign commerce in any slaughtering, meat-canning, salting, packing, rendering or similar establishment," and gives them full access to the establishment at all times, by day or night.

The act excludes from its provisions animals slaughtered by any farmer on the farm, and sold or transported as interstate or foreign commerce, and retail butchers and retail dealers in meat and meat food products supplying their customers, with the proviso that the Secretary of Agriculture is authorized to maintain the inspection provided for in the act, at any slaughtering, meat-canning, salting, packing, rendering, or similar establishment, notwithstanding such inspection and that the persons operating the same may be retail butchers, and retail dealers or farmers, and where the Secretary of Agriculture shall establish such inspection then the provisions of the act shall apply, notwithstanding such exception. The act contains highly penal provisions for the punishment of those who violate the same by fine or imprisonment or both.

The clear purpose of the act is to prohibit selling and offering for transportation, in interstate or foreign commerce, all meat food products which are unsound, or unfit for human food. To express it more briefly, the intent of the act is to prevent the sale of unwholesome food. It relates solely to establishments which are engaged in the preparation of meat and meat food products for interstate or foreign commerce. It cannot be pretended that there is any express provision in relation to establishments which do not pretend to manufacture or prepare meat or meat food products for interstate or foreign commerce. It is urged, however, upon the part of the government that because the tallow oil of the plaintiff cannot be distinguished from the oleo oil manufactured by the establishment, to which the act plainly applies, and because it might be used by some as a food, that therefore it is a meat food product within the meaning of the act.

If we accept as common knowledge historical facts, and accept also the correctness of the position of the government on this point, then the tallow candles which have been relished by Arctic explorers and their associates, and the salted hides which were so carefully apportioned and distributed to the defenders at the siege of Londonderry, were meat food products. In a civilized community, nothing can so destroy the desire for a manufactured product as an article of food as to have the same marked conspicuously "Inedible." The manufacturer of oleomargarine would not receive into his establishment tierces of oil so marked, except under cover of night. The mere fact, however, that some one might use the product of the plaintiff contrary to plaintiff's intention, and in fraud and deception of the public, ought not of itself to be a cause for subjecting the plaintiff to the highly penal provisions of the act without express words and merely by implication.

[2] If, however, the conclusion be not correctly found from the provisions of the act itself, and if the act be a doubtful expression of the intent of Congress with respect to such establishment as the plaintiff's, aid in the true construction of the act may be found in the construc-

tion placed upon it for many years by those charged with executing its provisions. Authority for this is found in Fairbanks v. United States, 181 U. S. 283–308, 21 Sup. Ct. 648, 658 (45 L. Ed. 862), where Mr. Justice Brewer said:

"An examination of the opinions * * * will disclose that they may be grouped in three classes: First, those in which the court, after seeking to demonstrate the validity or the true construction of a statute, has added that, if there were doubt in reference thereto, the practical construction placed by Congress, or the department charged with the execution of the statute, was sufficient to remove the doubt; second, those in which the court has either stated or assumed that the question was doubtful, and has rested its determination upon the fact of a long-continued construction by the officials charged with the execution of the statute; and, third, those in which the court, noticing the fact of a long-continued construction, had distinctly affirmed that such construction cannot control when there is no doubt as to the true meaning of the statute. * * * From this résumé of our decisions it clearly appears that practical construction is relied upon only in cases of doubt. We have referred to it when the construction seemed to be demonstrable, but then only in response to doubts suggested by counsel. Where there was obviously a matter of doubt, we have yielded assent to the construction placed by those having actual charge of the execution of the statute, but where there was no doubt we have steadfastly declined to recognize any force in practical construction. Thus, before any appeal can be made to practical construction, it must appear that the true meaning is doubtful."

[3] By the act Congress authorized the Secretary of Agriculture to make from time to time such rules and regulations as are necessary for the efficient execution of the provisions thereof. The Secretary of Agriculture adopted regulations covering meat inspection which became effective April 1, 1908, and section 8, page 7, of these regulations reads as follows:

"Sec. 8. *Meat Food Products.* Par. 1. A meat food product, within the meaning of the Meat Inspection Act and of these regulations, is considered to be any article of food intended for human use, which is derived or prepared, in whole or in part, from any edible portion of the carcasses of cattle, sheep, swine or goats, if the said edible portion so used is a considerable and definite portion of the finished food."

Over six years afterwards the Secretary of Agriculture adopted certain other regulations which became effective November 1, 1914.

"Regulation I.

"Par. 21. *Meat Food Product.* Any article of food, or any article which enters into the composition of food for human consumption, which is derived or prepared, in whole or in part, from any portion of the carcass of any cattle, sheep, swine or goat, if such portion is all or a considerable and definite portion of the article, except such articles as organo-therapeutic substances, meat juice, meat extract, and the like, which are only for medicinal purposes and are advertised only to the medical profession."

"Par. 22. *Meat and Products.* Carcasses, parts of carcasses, meat, products, food products, meat products, and meat food products of, or derived from, cattle, sheep, swine and goats, which are capable of being used as food by man."

It will be noticed specially that the word "capable" has been inserted in the definition last adopted. There is, in the latter definition, an attempt by the Secretary of Agriculture to define what shall con-

stitute a meat or meat food product. The power given him to make rules and regulations for the efficient execution of the provisions of the act does not give him power to add any provision to the act or to remove any part therefrom. It does not authorize him to say what is or what is not a meat food product, because the meaning of the words as found in the act is clear. The meat and meat food products which the act requires to be inspected must be such as are articles eaten by man, "proper for human consumption," and "fit for human food."

[4] That Congress cannot delegate legislative power to any executive officer is clear under all the authorities. Field v. Clark, 143 U. S. 649, 12 Sup. Ct. 495, 36 L. Ed. 294; and Morrill v. Jones, 106 U. S. 466, 1 Sup. Ct. 423, 27 L. Ed. 267. In United States v. Eaton, 144 U. S. 677–687, 12 Sup. Ct. 764, 767 (36 L. Ed. 591), Mr. Justice Blatchford, delivering the opinion of the court, used this language:

"Much more does this principle apply to a case where it is sought substantially to prescribe a criminal offense by the regulation of a department. It is a principle of criminal law that an offense which may be the subject of criminal procedure is an act committed or omitted 'in violation of a public law, either forbidding or commanding it.' 4 Am. & Eng. Enc. Law, 642; 4 Bl. Com. 5. It would be a very dangerous principle to hold that a thing prescribed by the Commissioner of Internal Revenue, as a needful regulation under the Oleomargarine Act, for carrying it into effect, could be considered as a thing 'required by law' in the carrying on or conducting of the business of a wholesale dealer in oleomargarine, in such a manner as to become a criminal offense punishable under section 18 of the act; particularly when the same act, in section 5, requires a manufacturer of the article to keep such books and render such returns as the Commissioner of Internal Revenue, with the approval of the Secretary of the Treasury, may by regulation require, and does not impose, in that section or elsewhere in the act, the duty of keeping such books and rendering such returns upon a wholesale dealer in the article."

In all those cases, as well as in others which could be cited, the distinction is carefully preserved between the power of an executive officer to make rules and regulations for the enforcement of an act which authorizes the same and the power to add to or take away from the act itself. Among the regulations adopted by the Secretary of Agriculture, and intended to take effect November 1, 1914, was the requirement of a certificate by the shipper that he should sign a certificate found in regulation 25, section 12, of which the following is the form:

Date .........., 191...

Inedible Fat.

Name of carrier   ..........................................................
Consignor         ..........................................................
Point of shipment ..........................................................
Consignee         ..........................................................
Destination       ................:.........................................

I hereby certify that the following described fat is not capable of being used as food by man, is suitable only for industrial purposes, is not for food purposes, and is of such a character or for such a use that denaturing is impracticable. I further certify that there is now on file with the Secretary of Agriculture a declaration by the establishment in which said fat was prepared,

or from which it is offered for shipment, in compliance with section 6 of regulation 4 of the regulations of the Secretary of Agriculture governing meat inspection.

| Kind of Product. | Amount and Weight. |
|---|---|
| ......................................... | ......................................... |
| ......................................... | ......................................... |
| ......................................... | ......................................... |

......................................
(Signature of Shipper.)

......................................
(Business Occupation of Shipper.)

......................................
(Address of Shipper.)

By that certificate the shipper is required to say that his inedible food is *not capable of being used as food by man.* "Capable" is the word that is specially objectionable in the definition, as well as in the certificate described in the later regulations. It requires the plaintiff to certify to what is not true. His product is capable of being used as food by man, just as the tallow candles and the salt hides were capable of being so used. Even the denatured product of the establishments which are subject to the inspection provided by said act are capable of being used as food by man, although they have been treated, or as it is called denatured, by the addition of a substance derived from petroleum, "Power Distillate."

So far as the evidence goes in this case, Power Distillate affects the taste as well as the value of the product of which it is a part. However, tallow oil so treated can perhaps support life as well as the product of the plaintiff, and is as capable of being used as food by man as the product of the plaintiff, although, perhaps, with less gratification to the consumer. It seems, therefore, that the Secretary of Agriculture has exceeded his authority by the regulations intended to become effective on November 1, 1914, in that such regulations tend to broaden the scope of the act of Congress.

It follows, therefore, that the act of the defendant Totten, notifying the defendant company not to transport the shipment of oil described in the certificate tendered to it, was not justified, and that the particular shipment of oil which was the immediate cause of the filing of the plaintiff's bill, and the other shipments of a like character when marked in the same way and when accompanied by similar certificates, should be received and carried by the carrier.

A decree may be presented in conformity with the prayers of the bill.