## SCHELL'S EXECUTORS *v.* FAUCHÉ.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK.

No. 690.   Argued January 28, 1891. — Decided March 2, 1891.

It appearing that at the date of the transactions in controversy, more than thirty years ago, it was the custom for importers to pass in protests with the entries, the court may presume that the usual course was pursued in respect of a protest produced under subpœna at the trial from the proper repository, where it had been lying for a long time, and that it was made and served at its date, and before the payment of duties.

Two papers attached together by a wafer, and signed on the bottom of the lower one, which when read together make a protest against two exactions of duties, are to be treated as a unit.

A protest against the exaction of duties is sufficient if it indicates to an intelligent man the ground of the importer's objection to the duty levied upon the articles, and it should not be discarded because of the brevity with which the objection is stated.

When such a protest is in proper form and attached to the invoice, the omission of date is immaterial.

The failure of a collector of customs to conform to a treasury regulation requiring him to record protests ought not to prejudice the rights of the importer.

A protest, otherwise valid and correct in form, against an exaction of excessive duties upon an importation of goods, which concludes "you are hereby notified that we desire and intend this protest to apply to all future similar importations made by us," having been long and consistently held by the court below to be a sufficient and valid protest against prospective importations, so that that doctrine has become the settled law of that court, and the general practice prevailing in the port of New York, this court accepts it as the settled law of this court.

In all cases of ambiguity the contemporaneous construction not only of the courts but of the departments, and even of the officials whose duty it is to carry the law into effect, is controlling.

THIS was a consolidation of six actions originally begun between September 1, 1857, and March 1, 1860, in the state courts of New York, and removed to the Circuit Court of the United States. The actions were brought against the collector of customs for the port of New York to recover back duties alleged to have been illegally exacted upon certain importations of mousselines de laine made by the copartnership of which the defendants in error are the survivors. The consolidated suit was tried in October, 1887, and a verdict found for the plaintiffs under the direction of the court for $50,-563.44. Judgment having been entered against the executors of Augustus Schell, deceased, late collector of the port, a writ of error was sued out from this court. The real question at issue was whether mousselines de laine were under the act of March 3, 1857, (11 Stat. 192,) subject to a duty of 19 or 24 per cent. That question, however, was excluded from this case under a stipulation "by and between the respective parties to this action that mousselines de laine, composed of worsted, or worsted with a satin stripe, were, under the tariff acts of 1857, subject to a duty of 19 per cent as claimed by the plaintiffs." As the duty exacted and paid was 24 per cent, judgment was

rendered for the difference, and the only questions argued by counsel in this court arose upon the admissibility of testimony, and the form, sufficiency and service of protests accompanying the several entries of merchandise, which are set forth and considered in the opinion of the court.

*Mr. Assistant Attorney General Parker* for plaintiff in error.

*Mr. Samuel Field Phillips*, with whom was *Mr. Frederic D. McKenney*, for defendant in error.

MR. JUSTICE BROWN delivered the opinion of the court.

Apparently in consequence of the decision of this court in *Cary* v. *Curtis*, 3 How. 236, to the effect that under the act of March 3, 1839, an action for money had and received would not lie against a collector of customs for duties paid under protest, Congress on February 26, 1845, enacted (5 Stat. 727) that nothing contained in the act of 1839 should be construed to take away or impair the right of any person who may have paid duties under protest, to maintain an action at law against a collector to ascertain the legality of such payment; "nor shall any action be maintained against any collector, to recover the amount of duties so paid under protest, unless the said protest was made in writing, and signed by the claimant, at or before the payment of said duties, setting forth distinctly and specifically the grounds of objection to the payment thereof." The questions presented by the record in this case turn upon the proper construction of this proviso, and upon the proper practice to be pursued in making and serving such protest.

1. Defendants objected to the receipt of Exhibit 5 and twenty-six other exhibits standing in like position, with the protests attached thereto. These exhibits were all entries of merchandise imported by plaintiffs in various ships, to which were appended the usual consignee's oath, and a specific protest duly signed by plaintiff's firm was also attached to each one by a wafer. Objection was made to the admission of such documents upon the ground that it did not appear that such

protests had been served upon the collector as required by the act of 1845; and second, that if so served, it did not appear that they had been served at or before the payment of the duty sought to be recovered, as required by the same act.

The act of 1845 requires, first, that the protest shall be in writing; second, that it shall be signed by the claimant; third, that it shall be made at or before the payment of the duties; and fourth, that it shall set forth distinctly and specifically the grounds of objection to the payment of such duties. But so far as respects the manner, or the person upon whom protest shall be served, the statute is silent, and we can only infer that from the nature of the proceedings it must be served upon the collector or his subordinate officer, or the person who receives the entry or the payment of the duties. In this silence of the statute, and in the absence of any treasury regulation upon the subject, it would probably be competent for the collector to receive such protest personally, or delegate his authority to one of his deputies. It is not at all singular that after the lapse of more than thirty years, it should be impossible to prove upon whom the service was made; but we are informed by the testimony of a custom of passing protests in with the entry, which seems to have prevailed for some time prior to the date of these transactions, and to have continued until the treasury regulations of 1857 were adopted. Now, as these protests were produced under subpœna at the trial from the proper repository where they appeared to have been lying for a long time, it is not unreasonable to infer that the usual course was pursued and the protests served according to the custom of the office. With regard to the conduct of a public office the presumption is that everything is done properly and according to the ordinary course of business, or, as expressed in the maxim, *omnia præsumuntur rite esse acta.* 1 Greenleaf Ev. sec. 38. The same presumption would justify us in inferring that the protest was made and served at its date, which, in the case of Exhibit 5, was January 30, 1858, and before the payment of duties, which appears upon the face of the entries to have been made February 1, or two days after the protest was signed.

2. Objection was also made to Exhibits 6, 11 and 13, upon the grounds we have already held to be insufficient, and upon the further ground that the protest consisted of two forms of protest, one printed on white, like exhibit No. 5, but unsigned, and the other on blue paper, the latter being pasted to the former and signed by the plaintiffs' firm. The two papers thus pasted together and signed, as aforesaid, were attached to the entry by a wafer and, read together, made a protest against two exactions, viz.: first, an excessive duty upon the mousselines de laine; and second, the exaction of a duty upon two and one-half or three per cent commissions, when, as claimed, such goods were liable only to duty upon two per cent commission. This consolidated protest was dated "New York, Feb. 10th," and addressed, immediately following the date, to "Augustus Schell, Esq., Collector of Customs," and signed at the bottom by Lachaise, Fauché & Co., the importers. Had it not been for the repetition of the word "Sir" at the beginning of each section of the protest, and the further fact that the protest was on two pieces of paper, there would be nothing to indicate that the plaintiffs did not intend in one communication to protest against the two exactions, viz.: the excessive duty on the mousselines de laine, and the duty on the commissions. While the protest is signed only at the end of the second piece of paper, no one would be misled into supposing that the signature, and the final clause applying the protest to all future similar imports, were not intended to apply as well to the protest against the duty assessed upon the mousselines de laine, as upon the commissions. And it is evident from the protest books of the custom-house in New York, that the entire paper was understood by the official who recorded it, as a single protest against two illegal exactions. Authorities are plentiful to the effect that papers attached together even by a pin are to be treated as a unit constituting one entire contract or memorandum. Thus in *Tallman* v. *Franklin*, 14 N. Y. 584, it was held that, where an auctioneer *pinned* a letter to him from the owner of certain real estate to be sold, which stated the terms of sale, on a page of his sales' book, and then made the residue of the

entries requisite to constitute a memorandum of the contract of sale on the same page of the book, and subscribed his name to it, the letter was to be taken as a part of the memorandum subscribed by the auctioneer, and was sufficient to take it out of the Statute of Frauds. To the same effect are *Hutcheon* v. *Johnson*, 33 Barb. 392, 395, where certain papers which had been *pasted* together were construed as a single memorandum; *Ginder* v. *Farnum*, 10 Penn. St. 98, where the sheets of a will were fastened together by a *string;* and *Martin* v. *Hamlin*, 4 Strobhart Law, 188. If, however, the papers are not connected together in fact, they are not considered as connected in law, unless, at least, the paper signed refers in some way to the other, which may then be construed as forming a part of it. *Hinde* v. *Whitehouse*, 7 East, 558; *Kenworthy* v. *Schofield*, 2 B. & C. 945. The proper test is, whether a person reading these papers would be deceived or misled as to the actual intention of the writer. We think there can be but one answer to this, and we hold the objection was not well taken.

3. The objections to the admission of Exhibits 1 and 2 are also untenable. These protests were in the following form: "New York, July 25, (27,) 1857. Augustus Schell, Esq., Collector of the Port of New York. Sir: We hereby protest against the payment of a duty of 24 per cent, charged by you on worsted stuff goods, claiming that under existing laws said goods are only liable to a duty of 19 per cent as a manufacture of worsted. We pay the amount exacted to obtain possession of the goods, claiming to have the difference refunded. Lachaise, Fauché & Co." Objection was made to these protests upon the ground that neither of them distinctly and specifically set forth the ground or grounds of objection to the payment of the duties exacted on any of the importations mentioned therein, as required by the act of 1845. In *Greely's Administrator* v. *Burgess*, 18 Howard, 413, 416, the protest was objected to upon the ground that it stated only "that the goods were not fairly and faithfully examined by the appraisers," and the proof offered was, that the appraisers did not examine any of the original packages, and only saw samples which had been taken several weeks before, and

which would not afford a true criterion by which to judge of the importation. Mr. Justice Campbell observed "This statute was designed for practical use by men engaged in active commercial pursuits, and was intended to superinduce a prompt and amicable settlement of differences between the government and the importer. The officers of the government on the one part, and the importer or his agent on the other, are brought into communication and intercourse by the act of entry of the import, and opportunities for explanation easily occur for every difference that may arise. We are not, therefore, disposed to exact any nice precision, nor to apply any strict rule of construction upon the notices required under this statute. It is sufficient if the importer indicates distinctly and definitely the source of his complaint, and his design to make it the foundation for a claim against the government." The protest was held to be sufficient. So, in *Arthur* v. *Morgan*, 112 U. S. 495, it was held that a protest against paying a certain duty upon a carriage, which stated that the carriage was "personal effects," and had been used over a year, and that, under the Revised Statutes, "personal effects in actual use" are free from duty, was sufficient, upon which the amount paid for duty could be recovered back on the ground that the carriage was free from duty as "household effects" under the same statute. It was said by Mr. Justice Blatchford: "The protest is not required to be made with technical precision, but is sufficient if it shows fairly that the objection afterwards made at the trial was in the mind of the party and was brought to the knowledge of the collector, so as to secure to the government the practical advantage which the statute was designed to secure." In the case under consideration, the importer claimed in substance in his protest, that the duty of 24 per cent was excessive, and that the goods were liable only to a duty of 19 per cent "as a manufacture of worsted." His insistence upon classifying them as a manufacture of worsted indicated clearly that the objection made was substantially to their classification as "de laines." We think the collector upon reading this protest could have no doubt in his mind that the intention of the importer was to

object to the failure to classify the goods as a manufacture of worsted. Some allowance must be made for the magnitude of business done at a large port, and the hurry and confusion necessarily incident to its transaction, as well as for the proneness of commercial men to look at the substance of things, rather than at the form in which their ideas are expressed. A protest which indicates to an intelligent man the ground of the importer's objection to the duty levied upon the articles should not be discarded because of the brevity with which the objection is stated.

4. Exhibits 14 and 41 contain protests which are without date, and objection was made to them upon that ground. But as it appeared that these protests were in proper form, the same form as No. 5, and were attached to the invoice of merchandise mentioned therein, and duly signed by the plaintiff's firm, we regard the omission of the date as quite immaterial.

5. Objection was also made to the admission of twenty-two protests upon the ground that there was no evidence that these had been copied in the record kept for that purpose. Treasury Regulation No. 387 provided that "whenever duties are paid under protest, collectors of customs will have the protest carefully and accurately copied at length in a record to be kept for that purpose, properly compared, verified and certified as a correct copy by the officer or officers making such comparison, the number and date of entry, name of importer, vessel and description of merchandise in regard to which the protest is made, to be duly stated on the record for the purpose of identification. This precaution is deemed necessary as well for the protection of the importer as the United States in the event of the loss of the original protest by accident or otherwise." The object of this regulation is thus stated to be in terms to supply secondary evidence in case of the loss of the original protest. If the original be produced, the record is of no value, and in any event, the failure of the collector to conform to the treasury regulation ought not to prejudice the rights of the importer. The latter would be powerless to require such record to be made, and the omission

to make it in a particular case should not be imputed to him. We have already held that the production of the protest from its proper custody was sufficient evidence that it had been served according to law.

6. The only remaining question to be considered is that of prospective protests, and this is really the main question in the case. In twenty-seven entries there are no protests to be found, nor is there any record nor any reference in the protest books of the custom-house indicating that any protest was served in the cases of such entries. These, however, are claimed by the plaintiffs to be covered by the concluding clause of the double protest number 6, which is in the following words : "You are hereby notified that we desire and intend this protest to apply to all future similar importations made by us." The same clause is found in the protest accompanying entries number 11 and 13, but in none others. Exhibit Number 14 is a specific protest attached to the entry. As no claim was made that any specific protest, however served, had any prospective effect, it follows that the claim for a repayment of duties on the twenty-four exhibits after number 13, is based upon the prospective clauses appearing in the charges and commission form of the pasted papers of Exhibits Number 6, 11 and 13, or is based on such clause or clauses, of one or more of these three exhibits. We attach no significance to the fact that the prospective clause of the protest is found at the end of the double protest, following the protest against the duty upon the commission, and is not found attached to that portion of the protest against the duty upon the mousselines de laine. As we have already held that the two protests constitute one paper, it necessarily follows that the concluding clause regarding the prospective protests should be applied to the entire paper, and to the protest against the duty upon the goods, as well as upon the commissions.

The objection to the admission of these papers raised distinctly the question as to the validity of prospective protests. It is admitted that the doctrine held by the court below upon the trial of this suit, that the prospective protests set forth

in the clauses attached to the special protests are sufficient as to all similar importations made by the same importer, is now, and has been for a long time, the settled law of that court, and the general practice prevailing in the port of New York. Such practice is claimed to be authorized by the case of *Marriott* v. *Brune,* 9 How. 619, decided in 1850. This was also an action for duties illegally exacted, in which the question was made as to the validity of a certain protest, which was somewhat vague in its terms, but was construed by the court as applying prospectively to all importations of "sugar and molasses." After this prospective protest the plaintiffs made a special protest in each of six several importations, but there were thirteen other importations made after the general protest, respecting which they relied upon the efficacy of the general protest. The court held that as the subsequent entries " all depended on a like principle, — as from the circulars of the department some doubt existed whether the excess of duties would not voluntarily be refunded — as the amounts in each importation were small, and both parties thus became fully aware that the excess in all such cases was intended to be put in controversy, and reclaimed, — we are inclined to think this written protest may fairly be regarded as applying to all subsequent cases of a like character, belonging to the same parties." This case was in affirmance of the opinion in *Brune* v. *Marriott,* Taney Dec. 132, in which Chief Justice Taney said that " a particular protest in each case is not required by the law. The object of the protest is merely to give notice to the officer of the government, that the importer means to claim the reduction, and to make known to the collector the grounds upon which he makes the claim. In these receipts this protest is sufficiently explicit, and covers all the cargoes upon which the duties had not been finally assessed and adjusted by the collector." It was said of this case in *Davies* v. *Miller,* 130 U. S. 284, 287, that " though criticised in *Warren* v. *Peaslee,* 2 Curtis, 231, it was generally regarded and acted on as laying down a general rule establishing the validity of prospective protests," citing *Steegman* v. *Maxwell,* 3 Blatchford, 365 ; *Hutton* v. *Schell,* 6 Blatchford, 48 ; and *Fowler* v. *Redfield,*

there cited; *Wetter* v. *Schell*, 11 Blatchford, 193; and *Choteau* v. *Redfield*, there cited. But as this case has been generally accepted as settling the law for this court, and the practice has grown up throughout the country of paying duties under such protests, — a practice to which eminent judges have lent their sanction, we think it too late for us to be called upon to overrule it. It is an acknowledged principle of law, that if rights have been acquired under a judicial interpretation of a statute which has been acquiesced in by the public, such rights ought not to be impaired or disturbed by a different construction, and if, notwithstanding Treasury Regulation Number 384, requiring protests to be special in each case, a practice has grown up in the different ports of entry of receiving prospective protests, the annulment of such practice might entail serious consequences upon importers who had acted upon the faith of its validity. As early as 1803, it was held by this court, in *Stuart* v. *Laird*, 1 Cranch, 299, 309, that a practical construction of the Constitution that the justices of the Supreme Court had a right to sit as circuit judges, although not appointed as such, was not open to objection. "It is sufficient to observe," says the court, "that practice, and acquiescence under it, for a period of several years, commencing with the organization of the judicial system, affords an irresistible answer, and has indeed fixed the construction. It is a contemporary interpretation of the most forcible nature. This practical exposition is too strong and obstinate to be shaken or controlled. Of course, the question is at rest, and ought not now to be disturbed." In all cases of ambiguity, the contemporaneous construction, not only of the courts but of the departments, and even of the officials whose duty it is to carry the law into effect, is universally held to be controlling. *McKeen* v. *DeLancy's Lessee*, 5 Cranch, 22; *Edwards' Lessee* v. *Darby*, 12 Wheat. 206; *United States* v. *Alexander*, 12 Wall. 177; *Peabody* v. *Stark*, 16 Wall. 240; *Hahn* v. *United States*, 107 U. S. 402; *Rogers* v. *Goodwin*, 2 Mass. 475; Endlich on Stats. sec. 357. Nor do we think the fact that in some cases specific protests were filed after the general prospective protest, necessarily shows an intention to abandon

any future claim under the prospective clause. If it were any evidence at all of such intent, it might properly be submitted to a jury, but defendants had no right to a peremptory instruction in their favor.

This disposes of all the material questions involved, and it results that the judgment of the court below must be

*Affirmed.*