L. S. DONALDSON CO., INC., AND DONALDSON REALTY CO., PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 9974, 25359.   Promulgated June 1, 1928.

*J. S. Y. Ivins, Esq.*, for the petitioners.
*J. Harry Byrne, Esq.*, for the respondent.

OPINION.

SMITH: The petitioners contend that for the purposes of exhaustion and invested capital the aggregate face value of the notes given in payment for the lease, that is, $200,883, should be taken as a basis and that the item of $9,557.30 was erroneously reported in income for the year 1919. These questions comprise the first three issues hereinafter discussed.

The Donaldson Co. purchased the lease in the year 1913 for $200,883 of noninterest-bearing notes payable monthly up to the year 1930. It then set up in its books under " lease account " an item of $125,000, which it estimated was the present value of the lease, and under " note account " an item of like amount which it estimated was the present worth or discount value of the $200,883 of notes out-

standing. Thereafter, at the end of each year, the notes outstanding were revalued and the difference between the values at the beginning and at the end of the year was charged to interest. The value of $125,000 was taken as the basis for exhaustion.

The essence of this transaction from the standpoint of the petitioners was the acquirement of a lease at a monthly rental increasing in amount from year to year. The giving of rental notes was incidental and does not affect the treatment properly to be accorded the transaction. The liability of the petitioners was substantially the same as it would have been had no notes been given. The lease had no capital value in excess of the liability of the petitioners to pay the notes as they fell due. Since the lease had no capital value the petitioners are not entitled to deduct from gross income in annual tax returns any amount for exhaustion thereof. In effect what we have is a lease under which the rental to be paid is represented by notes which fall due at various dates, over the life of the lease, in the same manner that the rentals stipulated under the ordinary lease fall due. A deduction should, therefore, be allowed on account of the payment of these notes as ordinary and necessary expenses of operation.

The petitioners claim the right to include in invested capital an amount in respect of this transaction. We fail to see, however, under the circumstances that the petitioners' invested capital was in any wise affected. Upon the evidence of record the lease had no capital value. In the computation of invested capital the liability of the petitioners in respect of the rentals to be paid under the lease should be ignored. Even if we should concede that the lease had a capital value equal to the present value of the notes, we should likewise have to hold that there existed a corresponding liability which would prevent an increase in invested capital on this account.

In these proceedings for the first time the petitioners claim the right to include in invested capital the appreciation in the value of the leases which the Donaldson Co. transferred, together with property owned in fee to the Realty Co. on January 1, 1914, for $999,700 of its capital stock. They likewise claim a deduction for the exhaustion of the several leases upon the basis of the cost or proven value on January 1, 1914, of each lease spread ratably over its remaining life. These issues constituted the fourth assignment of error.

The leases under discussion had been acquired by the Donaldson Co. prior to January 1, 1913, at a cost not in excess of rentals and had been carried upon its books at cost, as were the fee properties which were transferred with the leases, until just prior to the assignment of these properties to the Realty Co. in exchange for the capital

stock of that company. The Donaldson Co. then set up the amount of approximately $519,000, which it estimated was the excess of the cash value of the leases and fee properties over cost. This amount was likewise set up on the books of the Realty Co. after it had acquired the leases and fee properties. The petitioners now claim as paid-in surplus of the Realty Co. additional invested capital in respect of the leases in the amount of at least $406,300. In support of the value claimed, they rely chiefly upon the testimony of two witnesses who have been familiar with the real estate conditions in the City of Minneapolis, as well as with the particular property in question, for a number of years and were thoroughly qualified to express an opinion as to the value of the leases at January 1, 1914. One of the witnesses testified that five of the leases had values at January 1, 1914, in excess of rentals as follows:

| Property | Value |
|---|---|
| Koon-Merrill | $16, 500 |
| Welles | 198, 000 |
| Assoc. Realty Co | 137, 500 |
| Place | 49, 500 |
| Forman | 11, 000 |
| | 412, 500 |

The other witness ascribed the following values to the same leases:

| Property | Value |
|---|---|
| Koon-Merrill | $26, 232 |
| Welles | 183, 750 |
| Assoc. Realty Co | 156, 950 |
| Place | 63, 000 |
| Forman | 15, 000 |
| | 444, 932 |

He gave as his opinion that some of the other leases were liabilities rather than assets and that all of the leases taken together had an aggregate value of $406,300. Both of these values included an additional 10 per cent which was added for plottage.

The valuations seem to be reasonable. The property in question was situated in the heart of the business district of Minneapolis and had been steadily increasing in value for several years. We are convinced from all of the evidence that the leases had a fair market value at January 1, 1914, in excess of the rentals which the petitioners were obligated to pay, of not less than $406,300.

We will consider now the question whether this appreciation in value of the leases may be included in invested capital. The only argument made by the respondent against such inclusion was that the leases had no fair market value at, January 1, 1914, when they

were transferred with other assets to the Realty Co. in exchange for all of its capital stock. No argument was made that the values contended for could not be included in invested capital provided a valuation for them was proven. Since, however, the issue is placed squarely before the Board as to whether the amount may be included in consolidated invested capital it is necessary to consider the issue.

At the outset it should be noted that had the Realty Co. not been created and had not the Donaldson Co. transferred the leases to the Realty Co. there would be no ground for the contention that the $406,300 in issue be included in invested capital. Here, appreciation in the valuation of assets owned by a corporation may not be included in invested capital. *La Belle Iron Works* v. *United States*, 256 U. S. 377. It should be further kept in mind that we are here concerned with a transaction which occurred when consolidated returns were neither permitted nor required, and long before the enactment of an excess-profits or war-profits revenue act, where invested capital is a factor. Also, it is obvious that had the transaction occurred subsequent to March 3, 1917, there could be no question that the increase sought would be denied. (Section 331, Revenue Act of 1918.)

As stated above, no contention is made by the respondent that the increase sought can not be included in invested capital, provided the values are properly substantiated. This is consistent with his regulations and rulings. Under the Revenue Act of 1913, not only were parent and subsidiary corporations looked upon as separate and distinct corporate entities, but also were required to file separate returns and pay the tax shown due by such returns. Treasury Decision 2137, promulgated January 30, 1915, contains the following provisions:

*Returns of subsidiary companies—Where made.*—Under the provisions of the Federal income tax law and the regulations of this department, every corporation, joint-stock company or association, and every insurance company, regardless of its relation to another corporation, is held to be a separate and distinct entity and unless it comes within the class of organizations specifically enumerated in the act as exempt must make a separate and distinct return, complete in every detail.

\* \* \* \* \* \* \*

*Subsidiary companies must make returns.*—In the case of parent corporations owning all or practically all of the stock of subsidiary companies, it is held that both corporations are separate and distinct entities and that each must make true and accurate returns, accounting for, in detail, their separate gross income and deductions therefrom, and each such company will be required to pay the income tax on the net earnings shown by such return. \* \* \*

That is, each corporation was looked upon as separate and distinct, and we think properly so. Under such circumstances, when the Donaldson Co. was required to file a return for the year in which the

transaction in question took place, the regulations of the respondent required it to report as income subject to tax the difference between the cost or March 1, 1913, value of the leaseholds and the considerations received, which was the stock of the Realty Co. The entire difference between the cost of the leaseholds and the value of the stock received would represent profit to the Donaldson Co. It is immaterial that the fair market value of the stock of the Realty ·Co. is not proven by sales of the stock, since, under the circumstances of this case, the fair market value of the assets back of the stock is considered sufficient to establish the fair market value of the stock of the same amount. Had the leaseholds been sold by the Realty Co. in 1915, the basis for gain or loss on the sale would have been the cost to the Realty Co. in 1914 without regard to the prior cost to the Donaldson Co.

In view of the foregoing separateness of the two corporations for income-tax purposes when the transaction in question occurred, should the affiliated group be denied the benefit of the increase in surplus for invested capital purposes in the years when consolidated returns are required? We think not. While the regulations of the respondent do not cover the exact situation here presented, the right of a taxpayer to have the benefit of the increase here sought has long been recognized by him. See Law Opinion 1108, Cumulative Bulletin III–1, p. 412, and Solicitor's Memorandum 3384, Cumulative Bulletin IV–1, p. 277.

In our opinion a practice of the department adhered to over a period of years for the purpose of determining invested capital in a situation such as here presented should not be lightly disturbed. The situation is analogous to that which obtained in the case before the Circuit Court of Appeals, Third Circuit, in *Bellefield Co.* v. *Heiner*, 25 Fed. (2d) 560, where the Court said:

These departmental interpretations of the statute promulgated by formal regulations we think clearly put the instruments in suit in the class of notes. If the regulations have the force of law they dispel any lingering doubt raised by the few defining words of the statute. Such a pronouncement made " by a department of the government, addressed to and reasonably adapted to the enforcement of an act of Congress, the administration of which is confided to such department, has " on authority of the cases " the force and effect of law if it be not in conflict with express statutory provision." *Maryland Casualty Co.* v. *United States*, 251 U. S. 342, 349; *United States* v. *Grimaud*, 220 U. S. 506; *United States* v. *Birdsall*, 233 U. S. 223, 231; *United States* v. *Smull*, 236 U. S. 405, 409, 411; *United States* v. *Morehead*, 243 U. S. 607 (251 U. S. 349); *Red Wing Malting Co.* v. *Willcuts*, 15 Fed. (2d) 626. Moreover, in cases of ambiguity, contemporaneous construction by a department, long followed in practice, is generally held to be controlling. *Schell's Exts.* v. *Fanche*, 138 U. S. 562.

Does there exist justification for changing this established practice of the Bureau and holding in effect that because the Donaldson Co.

and the Realty Co. are required to file consolidated returns for the years on appeal and have their invested capital determined on a consolidated basis, adjustments should be made to eliminate from the surplus of the group, surplus which was earned on account of a transaction which occurred prior to the time when consolidated returns were required? We fail to find any language in the revenue acts requiring consolidated returns which, in our opinion, authorizes such a construction of the statute. The language of the statute negatives such a construction. Section 240 of the Revenue Act of 1918 requires that corporations which are affiliated shall " make a consolidated return of net income and invested capital *for the purposes of this title and Title III, and the taxes thereunder shall be computed and determined upon the basis of such return.*" (Italics supplied.) To hold that the foregoing provision requires the elimination of transactions of the character here in question would mean giving to the statute a retroactive effect which could be justified only where the language used plainly requires such an interpretation. There exists a very strong presumption against any construction of a statute which gives to it a retroactive effect and makes it apply to transactions occurring prior to its passage. *Eidman* v. *Martinez*, 184 U. S. 578; *Shwab* v. *Doyle*, 258 U. S. 529.

Since consolidated returns were not required prior to 1917, it seems reasonable to suppose that Congress did not intend that earnings of corporations which arise on account of dealings between the members of the group prior to 1917 should be eliminated in determining consolidated invested capital.

This is not inconsistent with the definition of consolidated invested capital which the Board laid down in *Farmers Deposit National Bank*, 5 B. T. A. 520, as follows:

* * * " Consolidated invested capital " means: (1) Actual cash paid in to the affiliated group; (2) actual cash value of tangible property paid in for stock or shares of the affiliated group; (3) paid-in or earned surplus and undivided profits of the affiliated group; (4) and (5) intangible property paid in for stock or shares of the affiliated group, subject to certain limitations. * * *

We also stated in the same opinion that:

If it is the purpose of the statute to disregard the separate and distinct legal entities of the members of an affiliated group and to treat the group as a single corporate taxpayer, then the treatment accorded to the group should recognize it as existing with the attributes of a single taxpayer.

See also *H. S. Crocker Co.*, 5 B. T. A. 537, wherein these statements appear, which are dicta in so far as the decision of the case is concerned:

It is our conception of the law that, for purposes of taxation, the affiliated group must be considered as a single economic unit. The requirement with

respect to computing the taxes of an affiliated group upon the basis of a consolidated return was first introduced into the law to prevent avoidance and resulting injustice, either to the Government or to the taxpayer, as the case might be, and not to create that situation. The normal treatment in the case of an affiliated group as a single economic unit, therefore, is to disregard the internal structure, to break down the separate legal existence of the constituent members, and to treat them in all respects, so far as taxation is concerned, as one.

\* \* \* \* \* \* \*

There is the further consideration that, under the affiliation provisions of the statute, the acquisition by one company of the stock of another, thereby creating affiliation, creates no additional investment in the affiliated group. By the act which creates the affiliation the group acquires a part of its own capital stock. The affiliation continues its existence until the stock of the subsidiary is disposed of by the parent corporation. \* \* \*

Likewise see *American La Dentelle, Inc.*, 1 B. T. A. 575; *Gould Coupler Co.*, 5 B. T. A. 499; *Interurban Construction Co.*, 5 B. T. A. 529; and *Risdon Tool & Machine Co.*, 5 B. T. A. 530. But the foregoing rulings do not hold that the affiliated group should be treated as a single economic unit or that such a group should be considered to have taken on the attributes of a single taxpayer prior to the time when consolidated returns were required. The status to which we referred in these decisions was the status after consolidated returns were required.

As we understand the issue here presented, it is not whether both the cost of the leaseholds to the Realty Co. and cost of the stock to the Donaldson Co. should be included in invested capital of the consolidated group. Of course, elimination would have to be made on account of this duplication when consolidated invested capital is determined. Our issue, in effect, is whether when Corporation "A" has an asset which cost it nothing, and prior to 1917 sells this asset to Corporation " B " for the entire issue of the latter corporation's stock of $50,000, which had a fair market value of this amount, the consolidated group would be allowed the benefit of $50,000 in its invested capital. In our opinion, by this transaction, Corporation "A" realized a profit of $50,000 which represents earned surplus to it, and that when invested capital is determined for the consolidated group, full effect must be given to this earned surplus. In the case at bar, we have already determined that the fair market value of the stock received by the Donaldson Co. was not less than $406,300 in excess of the cost of the leaseholds to this corporation. This represented earned surplus to the Donaldson Co. The Board is, accordingly, of the opinion that in determining consolidated invested capital of the petitioners for the years on appeal, full effect should be given to this earned surplus.

A further issue presented in this case is whether the petitioners are entitled to deduct from consolidated gross income an amount for the exhaustion of the leases for the years 1919 to 1923, inclusive. Since the effect of our decision with respect to the previous issue is to hold that there was a new cost of the leaseholds at January 1, 1914, it follows that the allowable deduction to the consolidated group on account of the exhaustion of the leaseholds should be on the basis of the cost or value of the leaseholds at January 1, 1914. If the leaseholds had been retained by the Donaldson Co., the basis for exhaustion would have been their value on March 1, 1913, but since they were acquired by the Realty Co. on January 1, 1914, the basis for exhaustion must be such acquisition cost at January 1, 1914.

The petitioners are claiming annual deductions for depreciation on the Fitterling buildings from July 7, 1919, to the end of 1923, in amounts equal to a pro rata part of the cost of the buildings in 1919 spread ratably over their remaining useful life. The respondent contends that the cost of the buildings should be capitalized and treated as a part of the cost of the 100-year lease secured at the same time, or as a part of the cost of the new building which was later erected upon the site.

It is alleged in the petition and admitted in the answer that the petitioners purchased the buildings July 7, 1919, for a consideration of $152,530. The evidence shows that they had made no definite plans at that time for removing the buildings or for erecting a new building. They continued to use the buildings in carrying on their merchandising business until the end of the year 1923. Early in the year 1924 they removed them and began construction of a new building.

The statute provides that in computing net income there shall be allowed as a deduction a reasonable allowance for the exhaustion, wear and tear of property used in the trade or business. The petitioners purchased the buildings in question and used them in carrying on their business and are, therefore, entitled to the deduction for exhaustion which they claim.

Since the remaining issue relating to certain adjustments of invested capital on account of taxes for prior years admittedly comes within section 1207 of the Revenue Act of 1926, the determination of the Commissioner in respect of such adjustments is approved.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*