(C. D. 650)

ASSOCIATED METALS & MINERALS CORP. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided June 17, 1942)

*Barnes, Richardson & Colburn* (*Joseph Schwartz* of counsel) for the plaintiff.
*Paul P. Rao*, Assistant Attorney General (*Richard H. Welsh*, special attorney), for the defendant.

Before TILSON, KINCHELOE, and DALLINGER, Judges

DALLINGER, Judge: These are suits against the United States, arising at the port of Chicago, brought to recover certain customs duties alleged to have been improperly exacted on particular importations of aluminum scrap. Duty was levied thereon at the rate of 3 cents per pound under paragraph 374 of the Tariff Act of 1930 as aluminum scrap, as that provision has been modified by virtue of the trade agreement between the United States and Canada promulgated in T. D. 49752, 74 Treas. Dec. 235, plus an additional tax of 3 per centum ad valorem under section 601 (c) (7) of the Revenue Act of 1932 as articles containing 4 per centum or more of copper by weight but not in chief value of copper.

The rate imposed under the Tariff Act of 1930 is not disputed. The sole question raised by the protest involves the 3 per centum ad valorem tax imposed under said section 601 (c) (7) of the Revenue Act of 1932.

At the hearing, held at Chicago on July 9, 1941, before Keefe, Judge, counsel for the Government moved to dismiss protests 27453–K and 27456–K on the ground that they were untimely.

In the case of protest 27453–K the record shows that the entry was liquidated on November 18, 1939, and on the same day the plaintiff sent a letter, addressed to the "U. S. Customs Service, District No. 39, Chicago, Illinois," which letter was duly filed in the collector's office on November 20, 1939. So far as here pertinent the said letter reads:

November 18th, 1939.

U. S. Customs Service,
District No. 39,
Chicago, Illinois.

      Re: 249 bags Scrap Aluminum ex SS PRINS FREDERICK
           HENDRIK, entry #923 by Gallagher &
           Ascher, dated August 8th, 1939,
           District #39, port of Chicago.

Gentlemen:

Gallagher & Ascher Company forwarded to us your notice of estimated additional duty due on the above lot in the amount of $449.76.

Enclosed please find our check for this amount. However, we wish to advise that this payment is made under protest.

This protest covers the fact that we are charged for duty on a quantity which was entered separately and for which duty had already been paid by us. We also protest against the levy of the copper duty.

A formal protest will be filed by Gallagher & Ascher Company who entered the lots.

In protest 27456–K, the entry was also liquidated November 18, 1939, and on the same date this plaintiff sent a letter which was

received at the Chicago customhouse on November 19, 1939, which, so far as pertinent, reads as follows:

November 18th, 1939.

United States Customs Service,
District No. 39,
Chicago, Ill.

Re: 189 bags Scrap Aluminum ex SS
RUTENFJELL, entry #1328 by Gallagher &
Ascher, Dated August 8th, 1939, District
#39, port of Chicago.

Gentlemen:

Gallagher & Ascher Company forwarded to us your notice of additional estimated duty due in the amount of $31.68.

Enclosed please find our check for this amount. However, we wish to advise that this payment is made under protest for reasons as outlined in our enclosed letter concerning entry No. 923.

It also appears from the papers that the "formal protest" referred to in protest 27453–K was in each instance filed more than 60 days after liquidation, and consequently may not be considered by this court.

Counsel for the Government in making his motion to dismiss, which motion was taken under advisement by the trial judge pending decision by this division, contended that the letters in question were evidently not considered as formal protests by the importer nor were they so treated by the collector, and that they do not meet the requirements of section 514 of the Tariff Act of 1930 in that they do not inform the collector of the nature of the claim, but merely protest against the levy of the copper tax.

Government counsel in his brief filed herein also contends that the letters in question merely express dissatisfaction with the copper tax but make no affirmative claim that the merchandise was not subject to such tax in that it did not contain 4 per centum or more of copper by weight, and cites the decision in *Robert Boos* v. *United States*, Abstract 21453, 62 Treas. Dec. 882. It is to be noted, however, that in the memorandum to accompany invoice included in the official papers herein the appraiser clearly indicates that the only issue involved herein was the presence of more than 4 per centum of copper by weight in the instant merchandise. Hence, it follows that the collector was fully informed of the one and only issue raised by the plaintiff's letter of protest.

We are of the opinion that in protest 27453–K the protest is sufficient and that the decision in *United States* v. *Salambier*, 170 U. S. 621, is controlling. In that case, as in the instant case, the protest was in the form of a letter, which reads as follows:

Hon. Joel B. Erhardt, *Collector.* Sir: I do hereby protest against the rate of 50% assessed on chocolate imported by me, Str. *La Bretagne*, June 23/91. Import entry 96, 656.—M S. No. 52/53.

I, claiming that the said goods *under existing laws* are dutiable at two cts. per lb., and the exaction of a higher rate is unjust and illegal, I pay the duty demanded to obtain possession of the goods, and claim to have the amt. unjustly exacted refunded. Very respectfully, M. Salambier, J. H. Dumont, *Atty.*

The Supreme Court, in holding the above protest to be sufficient, said:

A protest is not required to be made with technical precision, but is sufficient if it shows fairly that the objection afterwards made at the trial was in the mind of the party and was brought to the knowledge of the collector, so as to secure to the Government the practical advantage which the statute was designed to secure. (Arthur *v.* Morgan, 112 U. S. 495.)

A protest which indicates to an intelligent man the ground of the importer's objection to the duties levied upon the articles should not be discarded because of the brevity with which the objection is stated. (Schell's Executors *v.* Fauché, 138 U. S. 562; Heinze *v.* Arthur's Executors, 144 U. S. 28.)

See also decisions in *G. Gennert* v. *United States*, T. D. 42805, 53 Treas. Dec. 661, and *United States* v. *Macksoud Imptg. Co. et al.* (25 C. C. P. A. 44, T. D. 49041).

While we are satisfied that protest 27453–K is sufficient, we are not similarly convinced regarding protest 27456–K. The latter contains the following statement:

\* . \* \* we wish to advise that this payment is made under protest for reasons as outlined in our enclosed letter concerning entry No. 923.

Clearly, this is not a compliance with the provision in said section 514 which requires that a protest must set forth "distinctly and specifically, *and in respect to each entry, payment, claim, decision, or refusal, the reasons for the objection thereto.*" [Italics ours.]

In the case of *Robert G. Winny* v. *United States* (G. A. 5683, T. D. 25297, 7 Treas. Dec. 774) this court (then the Board of General Appraisers) laid down the rule that a protest must show upon its face the reasons for the importer's objection to the payment of duties; and that a reference to another and separate statement of such reasons, alleged to have been made elsewhere in another protest, is not a compliance with customs law. In that case, the court, speaking through Somerville, G. A., said:

In our opinion, the protests are insufficient, and fail to comply with the requirements of section 14 of the customs administrative act of June 10, 1890, providing that protests shall set forth therein "distinctly and specifically, and in respect to *each* entry or payment, the reasons for his [the importer's] objection thereto." It is certainly not specific or definite to base objections of this kind on grounds "heretofore stated" by the importers at the time of the payment of the estimated duties. \* \* \*.

See also *United States* v. *Bayersdorfer*, T. D. 24923, 7 Treas. Dec. 81.

On authority of the last-cited cases it follows that protest 27456–K must be, and the same hereby is, dismissed as insufficient.

Coming now to the merits, the plaintiff offered in evidence the testimony of two witnesses. The first, Alfred Dreyfuss, receiving clerk and storekeeper in the employ of the United States Reduction Co. of East Chicago, Ind., testified that his company is engaged in the business of smelting and refining aluminum and other nonferrous metals; that he receives and inspects all the raw materials which arrive at his company's plant and supervises its distribution to the various departments; that in 1939 he received a shipment imported by the plaintiff-corporation at the port of Chicago under Chicago entry 46, dated July 5, 1939, via. S. S. *Harpefjell;* that he weighed said shipment and turned the material over to the furnace where he saw it melted; that a sample thereof was taken from the furnace and turned over to the laboratory, the laboratory number being 1006; that on August 31, 1939, he also received from the plaintiff-corporation a shipment imported under entry 923, dated August 8, 1939, at the port of Chicago, and that the same procedure was followed as in the case of entry No. 46, the laboratory report number being 1271.

On cross-examination, after stating that the furnace is maintained at a temperature necessary to melt the metal, which ordinarily is between 1,100 and 1,300 degrees, the witness testified in part as follows:

X Q. Was the entire melt stirred before the sample was taken?—A. That is always done.

\*        \*        \*        \*        \*        \*        \*

X Q. Do you allow that melt to settle some time before you take the sample? Does it stand for a while before you pour it?—A. Yes,  \*  \*  \*. There are certain kinds of residues which have to be skimmed off.  \*  \*  \*.

\*        \*        \*        \*        \*        \*        \*

X Q. Do you know whether or not the residue that you took off contains any copper?—A. The residue contains exactly the same thing what the other metal contains.

The second plaintiff's witness, Samuel D. Robinson, a qualified metallurgist in the employ of the United States Reduction Co., testified that he made analyses of samples of laboratory Nos. 1006 and 1271, reports of which were admitted in evidence as exhibits 1 and 2, respectively; that the amount of copper shown in exhibit 1 was 3.7 per centum, and in exhibit 2, 3.75 per centum; that the aluminum scrap constituting the merchandise at bar was used to deoxidize steel; and that the steel mills do not like over 4 per centum of copper in their deoxidizing aluminum because the copper goes into the steel.

Referring to his method of obtaining samples of shipments of aluminum scrap, the witness testified in part as follows:

Q. Is that sample taken from the entire lot which is melted up?—A. That would be representative of the whole lot. That is the only way you can get an average sample.

\*        \*        \*        \*        \*        \*        \*

Q. Is the method by which these samples were analyzed for the purpose of determining the copper content and other things a standard method?—A. Standard method developed by us, and also approved by the Aluminum Research Institute.

Q. Is it, in your opinion, an accurate method?—A. I am sure it is. It has to be accurate, because we are checked. Most of our aluminum ingots were checked by outside laboratories. Steel mills check the analyses.

On cross-examination the witness testified that when the scrap aluminum was melted there was no settling of copper at the bottom of the pot; and that when the melted aluminum was ready to stand for some time there was never any segregation of copper under 10 per centum.

On redirect examination the witness testified that the samples which were analyzed were samples of each complete shipment melted down.

The Government offered in evidence the testimony of four witnesses. The first, Andrew W. Roberts, customs inspector at the port of Chicago, testified that he had supervised the weighing of the merchandise at bar and the taking of samples therefrom; that the merchandise in protest 27453–K consisted of 249 bags of scrap aluminum of which he opened 10 bags and took samples therefrom; that he turned the samples over to examiner Child, and that the same consisted of pieces of aluminum scrap from 7 to 10 inches long and from 2½ to 4 inches wide.

The second Government witness, William Packer, customs inspector at the port of Chicago, testified that he took several samples from the aluminum scrap covered by the entry in protest 5832–K, said samples averaging 10 inches long and from 3 to 4 inches wide, and that he turned the samples over to examiner Child.

The third Government witness, James B. Child, examiner of merchandise at the port of Chicago, testified that he carefully examined the samples given him by the two previous witnesses and sent the same to Henry B. Taylor, Government chemist at the port of Chicago, for analysis; that in accordance with his usual custom he had previously requested Gallagher & Ascher Co., customs brokers of the plaintiff-corporation, to furnish him with samples of each shipment involved herein together with a copy of the chemist's report of the same; and that failing to receive the samples he accepted the report of the Government chemist.

On cross-examination the witness testified in part as follows:

X Q. You did not send all of those samples up to the laboratory for analysis; is that right?—A. That is right.

X Q. Can you give us an idea of what part of the samples you sent to the laboratory for analysis? Did you send half, or more, or less than half?—A. Probably 20 per cent.

\*     \*     \*     \*     \*     \*     \*

X Q. Did you hear Mr. Robinson, the metallurgist of the U. S. Reduction Company, testify?—A. I was present, but I had difficulty in hearing him way back there.

\* \* \* \* \* \* \*

X Q. I think you testified that you tried to get a sample and analysis of this material; is that right?—A. Yes.

X Q. Necessarily that would have had to come from the U. S. Reduction Company; isn't that correct?—A. Inasmuch as they are not the principals in the thing, the letter was not addressed to them.

\* \* \* \* \* \* \*

X Q. You know the material went out there, don't you?—A. I am so advised by the collector that that was the place of examination.

\* \* \* \* \* \* \*

X Q. Do you have any reason to doubt that that analysis shows it was under 4 per cent copper?—A. Yes.

\* \* \* \* \* \* \*

X Q. Do you believe it, or don't you?—A. I believe their analysis of what they analyzed is correct, but I am not sure they analyzed the right samples.

\* \* \* \* \* \* \*

X Q. Isn't it a fact that if you had received an analysis from the U. S. Reduction Company, and a sample showing a copper content of less than 4 per cent, you would have accepted that?—A. I would have given it great consideration. I don't know whether I would have accepted it or not. \* \* \*.

The fourth and last witness for the Government, Henry B. Taylor, United States chemist at the port of Chicago for the past 18 years, testified that he had made analyses of the pieces of aluminum scrap covered by protest 27453–K sent to him by Mr. Child, for the purpose of determining the copper content; that as a result of said analyses he obtained .0204 grams of copper which is 4.08 per centum copper; that he also made analyses of two samples of aluminum scrap covered by protest 5832–K, and that he found one of the samples contained 4.14 per centum copper by weight and the second contained 4.02 per centum copper by weight. On cross-examination the witness testified in part as follows:

X Q. Is it a fact that you simply analyzed one piece out of each of the first two shipments, and two pieces out of the last shipment?—A. No.

X Q. How many pieces did you analyze?—A. We took small pieces off each piece that was sent up.

X Q. Sent up by Examiner Child?—A. Yes.

On redirect examination the witness testified as follows:

R. Q. Is that a standard recognized method for determining copper?—A. That is one of the standard methods for determining copper.

Samuel D. Robertson was then recalled by the plaintiff and testified in part as follows:

R. Q. Will you please state whether the percentages of copper content concerning which you testified are the percentages by weight?—A. By weight.

R. Q. Did you hear Mr. Taylor, the Government chemist, testify?—A. Yes.

\* \* \* \* \* \* \*

R. Q. Will you please state whether in your opinion the method pursued by your company, or the method pursued by the Government, is more accurate in determining the per cent of copper content?—A. I wouldn't like to criticize Mr. Taylor's method. The method would not be accepted in the aluminum industry.

R. Q. Do you consider your method more accurate?—A. Yes.

R. Q. Why?—A. It is used by any number of different aluminum companies for determining copper in aluminum.

R. Q. Did you hear Examiner Child testify as to the reasons why he might doubt your analysis—something about skimmings?—A. I remember.

R. Q. What is your answer to that ? Just tell us whether the skimmings would have anything to do with the copper content?—A. No. We find from actual analysis that the skimmings analyze very closely to the metal they are obtained from. Theoretically they should go lower in copper than the metal, because your aluminum is more readily oxidized than copper. Instead of your copper decreasing in your meltings, theoretically it ought to increase. Any oxidation would be in the aluminum in preference to the copper.

From this record we find that the aluminum scrap covered by protests 5832–K and 27453–K, constituting the imported merchandise at bar, contains less than 4 per centum of copper by weight; and we accordingly hold said merchandise not to be subject to the provisions of section 601 (c) (7) of the Revenue Act of 1932 nor taxable thereunder, as alleged by the plaintiff. That claim is therefore sustained; but as to all other merchandise the claims are overruled. Judgment will be rendered accordingly.